1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3    _____

4                                    )

5    KARL V. FARMER,                 )

6            Plaintiff,              )

7    v.                              )    CIVIL ACTION NO. 1:04-cv-00441-SM
                                          05- 10117A'GS
8    NEAL D. GOLDMAN                 )

9            Defendant.              )

10   _____)

11                **AMENDED COMPLAINT**

12   **STATEMENT OF JURISDICTION**

13   Neal D. Goldman was the executive vise president, general counsel, chief administrative

14   officer and corporate head of the Human Resources at Polaroid Corporation during the

15   time of this issue.  Neal was the plan administrator or committee chairman in the event of

16   plan administration by committee for health, welfare, severance benefit and retiree

17   benefit plans for Polaroid Corporation.  As such Neal had a fiduciary responsibility to

18   notify/alert potential beneficiaries that a benefit that the beneficiary had been promised

19   would not be available.

20   **BACKGROUND**

21   In July of 2001 Karl V. Farmer (Karl), Polaroid ID# 11642C, was notified by his

22   manager, Craig Gustafson, that his position of manager in the Customer Services

23   organization was to be eliminated as of the end of September, 2001.  He was also notified

1    that because of his age (54.7 years) and years of service (30.27 years) the severance

2    program that was available would consider Karl a "cross-over" retiree and Polaroid

3    would consider him a bone a fide retiree.

4  Karl was informed of his options:

5    Leave Polaroid under the severance program with the benefits (see Exhibit A – letter of

6    severance) plus 6 months medical and dental coverage at Polaroid employee rates, then

7    medical coverage at retiree rates thereafter.

8                 or

9    Find other employment within Polaroid in another division or department.

10    Karl was also informed of an available comparable level engineering position in

11    Polaroid's Wayland building.  The job had been vacated voluntarily and needed to be

12    filled.   On September 11, 2001, Karl interviewed with Diego Betancourt and was told if

13    he decided to remain in Polaroid he could have the job.

14    Needing more input Karl had discussions with his managers and the human resource

15    representative but they had no new information.

16    During the summer there had been a number of rumors that Polaroid was going into

17    bankruptcy and/or was going to be purchased and merge with Gillette, Fuji or some other

18    company.  In mid-August Polaroid senior management conducted a series of meetings

19    across the company to clarify the corporation's position.

20    At the meeting Karl attended in 201 Burlington Rd., Bedford, MA on or about August 15,

21    2001, Neal Goldman, vice president and head of corporate Human Resources

22    organization was the officer who gave the presentation.

23    The main inputs given at the meeting via presentation or answers to questions were:

1       <u>Statement from presenter:</u>  Polaroid had no intentions at that time to file for bankruptcy.

2       Although because of Polaroid's adverse financial position bankruptcy protection may be

3       a viable option at some time.  (no time frame or deadline given)

4       <u>Statement from presenter:</u>  As far as our financial position regarding our debtors, we have

5       them where we want them.  They have to come to us.

6       <u>Question from the floor:</u>  If I accept a severance package and Polaroid files chapter 11 do

7       I still get my severance money?

8       <u>Answer:</u>  As far as he (Neal D. Goldman) knew, if Polaroid did file for bankruptcy the

9       court would allow the payment of severances.  (Polaroid's choice would be to pay

10      benefits even if Polaroid did file for bankruptcy protection)

11  Other issues effecting Karl's decision:

12      Polaroid's severance programs had been significantly reduced over the last 4 – 5 years.

13      Previous programs would have yielded as much as 2.5 years pay with Karl's seniority.

14      The most recent program, less than a year previous, was 25% more pay for the same

15      seniority.

16      Karl had thought of teaching school.  With the severance money he could avail himself of

17      the necessary training or certificates needed to do so.

18      All options considered Karl made the decision to accept the severance program and leave

19      Polaroid.  The severance termination of employment date was September 28, 2001.  The

20      sign-out date was two (2) weeks prior to termination date.

21  **TERMINATION OF SEVERANCE PLAN**

22      On October 11, 2001 Karl was to receive his first payment. Karl called Polaroid to

23      inquire whether the payment would be by check or automatic deposit into his checking

1    account.  He was told at that time it would be deposited if he had his regular paycheck

2    deposited.  However, people had been calling in complaining that they had not received

3    their checks.  The following day, October 12, 2001 Polaroid announced they had filed for

4    chapter 11 bankruptcy protection.  They also announced they were terminating all retiree

5    health and welfare benefits, effective immediately.

6    Recalling the August meeting in which Neal Goldman said to his knowledge severances

7    where paid during bankruptcy, Karl called to inquire what that meant for his severance

8    plan agreement.  Karl was told the agreement was null and void and not going to be

9    upheld by Polaroid.  After leaving Polaroid under a severance agreement in September,

10    Karl ended up getting no salary, no severance, no health insurance and neither interim life

11    nor dental insurance as promised.

12    **ARGUMENT**

13    This was a breech of fiduciary responsibility of the plan administrator, Neal Goldman.

14    Had Polaroid's plan administrator executed his fiduciary responsibility and notified Karl

15    that they had intended to file for bankruptcy protection and/or that Polaroid was not going

16    to honor the severance agreement, Karl would have accepted the position in Wayland.

17    Because the position that was offered to Karl is still an active position in the "new"

18    Polaroid, Karl would have maintained his salary and benefits and would still be an active

19    Polaroid employee.   Also for that consideration is the likelihood Karl would have

20    received performance bonuses given to "the new" Polaroid's employees in the last two

21    years.

22    **EVIDENCE**

1   Karl served as Chair of Official Committee of Retirees of Polaroid as recognized by the
2   federal bankruptcy court processing Polaroid's bankruptcy protection case and as the
3   chair Trustee of the Polaroid Retirees Trust.  In this capacity and independently learned
4   that:

5       • Polaroid was in fact discussing bankruptcy at least as far back as June 2001

6       • The law firm that performed the legal counsel for Polaroid during the chapter 11
7         bankruptcy protection proceedings was hired in July of 2001.

8       • In August 2001 Polaroid offered past Polaroid Corporate officers a % on the
9         dollar buy-out for their interest in the company.

10      • On or about October 7, 2001 Polaroid met with the Polaroid Retirees Association
11        (PRA) board of directors to notify them that Polaroid was terminating all retirees'
12        health and welfare benefits as of October 31, 2001.  (This apparent gesture of
13        good faith turned out to be another misrepresentation by Polaroid.  They
14        terminated the benefits as part of their chapter 11 bankruptcy filling on October
15        12, 2001, retroactive to October 1, 2001, without further notice to the PRA.)

16  During the committee's investigation of Polaroid's process of declaring chapter 11, with
17  Greenberg Traurig, Karl learned that the breech of fiduciary responsibility actually had in
18  fact occurred.

19  From the deposition of Neal Goldman Tuesday, April 2, 2002, by Greenberg Traurig,
20  LLP at One International Place, Boston, Massachusetts.

21      • On pages 54 and 55 Neal Goldman admits that Skadden Arps Slate
22        Meagher & Flom LLP was hired in July/August of 2001 to assist Polaroid
23        through restructuring, i.e. chapter 11 bankruptcy protection.

1    • On pages 99 – 101 Neal Goldman discusses the details of the involuntary

2    severance plan and the employees' options.  Also discussed were the

3    erosion of benefits from past to present severance plans.

4    • On page 102 – 104 Neal Goldman admits that he did not execute his

5    fiduciary responsibility to notify employees or retirees that there benefits

6    were to be severed.

7    • On pages 107 and 108 Neal admits to being a fiduciary.

8  **SETTLEMENT REQUEST**

9    Karl had this salaried position offer and was misled by the information given by Neal

10   Goldman Polaroid's presenter at the August meeting. Karl should be entitled to receive

11   all wages and performance bonuses that would have been paid and the medial payments

12   made by Karl for the last 3 years.

13   Karl V Farmer is moving for a settlement against Neal D. Goldman for the breech of

14   fiduciary responsibility of $750,000.00 or whatever relief this court deems appropriate.

15                         KARL V. FARMER

16

17

18                         30 Sawyer Rd.

19                         Hampstead, NH 03841

20                         (603) 329-1165

21

22   Dated:  March 2, 2005

23

1    Cc: to Neal D. Goldman

2    By his attorney,

3    Michael R. Pontrelli

4    Foley & Lardner, LLP

5    111 Huntington Avenue

6    Boston, Massachusetts 02131

7    (617) 342-4000

1

PAGES 1 - 143

1                                        EXHS. 1 - 9

2

     IN THE UNITED STATES BANKRUPTCY COURT

3

       FOR THE DISTRICT OF DELAWARE

4

5   - - - - - - - - - - - - - - - - - - - - - - - - - -

                    ) Chapter 11

6   In Re:

7   Polaroid Corporation, et al. ) Case 01-10864(PJW)

             Debtors ) Jointly Administered

8

9   - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13        Deposition of Neal D. Goldman

14          Tuesday, April 2, 2002

15         Greenberg Traurig, LLP

16     One International Place - 3rd Floor

17         Boston, Massachusetts

18

19

20

21   - - - - - - - - - -   J. EDWARD VARALLO, RMR, CRR   - - - - - - - - - - -

22            COURT REPORTER

23     K. L. GOOD & ASSOCIATES, BOSTON, MASS.

          781.598.6405

24

2

1  Counsel for Polaroid Corporation:

2      Gregg M. Galardi, Esq.

3      Robert S. Saunders, Esq.

4      Skadden Arps Slate Meagher & Flom LLP

5        One Rodney Square

6        10th and King Streets

7        Wilmington, Delaware  19801

8        302.651.3000  Fax 302.651.3001

9      Robert Gallagher, Esq.

10     Groom Law Group, Chartered

11       1701 Pennsylvania Avenue, N.W.

12       Washington, D.C.  20006

13       202.861.9384

14

15  Counsel for the Official Committee of Retirees of 16

Polaroid Corporation:

17     Gary R. Greenberg, Esq.

18     *Alfred A. Gray, Esq.

19     Annapoorni R. Sankaran, Esq.

20     Greenberg Traurig, LLP

21       One International Place - 3rd Floor

22       Boston, Massachusetts  02110

23       617.310.6000  Fax 617.310.6001

24

3

```
1    Counsel for Committee of Unsecured Creditors:
2         Nava Hazan, Esq.
3         Akin Gump Strauss Hauer & Feld, LLP
4          590 Madison Avenue
5          New York, New York  10022
6           212.872.1000  Fax 212.872.1002
7
8    Counsel for JP Morgan Chase Bank:
9         Thomas A. Tormey, Esq.
10        Davis Polk & Wardwell
11         450 Lexington Avenue
12         New York, New York  10017
13          212.450.4000  Fax 212.450.4800
14
15
16
17
18
19
20
21
22    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
23        * NOTE:  Not present at beginning of deposition.
24
```

4

1    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

2                        MORNING SESSION

3                          9:43 a.m.

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5                      NEAL D. GOLDMAN,

6        having been first duly sworn on oath,

7        was examined and testified as follows:

8                        EXAMINATION

9    BY MR. GREENBERG:

10       Q.    Would you state your full name and your

11   residential address, please.

12       A.    Neal David Goldman, 6 Carroll Drive,

13   Westborough, Massachusetts.

14       Q.    And, Mr. Goldman, are you employed?

15       A.    Yes.

16       Q.    By whom?

17       A.    Polaroid Corporation.

18       Q.    And how long have you been employed by

19   Polaroid?

20       A.    About four and a half years.

21       Q.    What position do you hold with Polaroid?

22       A.    Executive vice president, general counsel,

23   chief administrative officer.

24              MR. GALARDI:  Gary, before we go on, I

5

1   just want to make it clear again this is all under a

2   confidentiality agreement and sealed until we can

3   work out what parts go into the record, et cetera.

4   Everybody here is a party to a confidentiality

5   agreement.  We're working one out with the law firm

6   of Greenberg Traurig.

7           So with that understanding, and we will

8   hopefully work out Thursday what can and what cannot

9   go in.

10          MR. GREENBERG:  That's fine.

11          MR. GALARDI:  Thank you.

12  BY MR. GREENBERG:

13      Q.   Do you hold any other positions within

14  Polaroid?

15      A.   I'm the secretary as well.

16      Q.   Anything else?

17      A.   I am chair of the plan administrator for

18  the pension plan.

19      Q.   I'm sorry.  What was that?

20      A.   Plan administrator for the pension.

21      Q.   And how long have you held the position of

22  chairman of the plan administrator, did you say?

23      A.   Right.

24      Q.   Is that a separate committee or you just

6

1    hold the position of chairman?

2        A.    No, it's a committee.

3        Q.    And you are chairman of that committee?

4        A.    Yes.

5        Q.    How long have you held that position?

6        A.    I believe since somewhere in the summer of

7    2001.  I don't remember the exact date.

8        Q.    Who held the position before?

9        A.    Harvey Greenberg.

10       Q.    Who was on the committee at the time

11   Mr. Greenberg was the chairman, just immediately

12   prior to your ascending to that position?

13       A.    I don't know.

14       Q.    Were you on the committee?

15       A.    No.

16       Q.    Presently is there a committee that

17   encompasses this plan administrator, plan

18   administration?

19       A.    Yes.

20       Q.    Who is on that committee?

21       A.    Don Halstead, Deirdre Evans, Janet Cramer,

22   Connie McGillivray.

23       Q.    Are all those four people employees of

24   Polaroid currently?

7

1      A.    Yes.

2      Q.    Have they been on this committee since you

3   ascended to the chairmanship?

4      A.    Yes.

5      Q.    Just as you understand it, what are the

6   duties and responsibilities of that committee?

7      A.    That committee administers the pension,

8   dealing with appeals, and makes recommendations

9   regarding the pension to management.

10      Q.    When you say the pension, are there any

11   other areas that that committee administers?

12      A.    It also makes recommendations to the

13   company on other areas of medical benefits.

14      Q.    As it relates to retirees or as it relates

15   to active employees also?

16      A.    As it relates to employees.

17      Q.    Pardon?

18      A.    Employees.

19      Q.    Just employees?

20      A.    Yes.

21      Q.    As I understand, prior to when you took

22   this chairmanship you were not involved as a member

23   of the committee.  Is that right?

24      A.    That's correct.

8

1    Q.    As of the summer of 2001, did Polaroid

2    provide benefits for retirees?

3    A.    Yes.

4    Q.    And what benefits did it provide

5    generically?

6    A.    It provided retiree medical benefits and

7    life insurance benefits.

8    Q.    Was there a committee that was responsible

9    for overseeing those benefits, a committee at

10   Polaroid?

11   A.    I don't know.

12   Q.    You don't know?

13   A.    Don't know.

14   Q.    How long have you been general counsel of

15   Polaroid?

16   A.    Since September of '99.

17   Q.    And how long have you been secretary of

18   Polaroid?

19   A.    Since September of '99.

20        MR. GREENBERG:  Could we mark this as

21   Goldman Exhibit 1, a document which is Bates-stamped

22   PRD-EC-001134 through 50.

23        (Goldman Deposition Exhibit 1 marked for

24   identification.)

9

1   BY MR. GREENBERG:

2       Q.   Mr. Goldman, can you identify what has

3   been marked as Goldman Exhibit 1?

4       A.   (Pause)  It's a summary of Polaroid

5   benefits.

6       Q.   As of when, sir?

7       A.   2001.

8       Q.   Do you know who prepared the document?

9       A.   No, I don't.

10      Q.   Do you know as of what date in 2001 this

11  is applicable?

12      A.   No, I don't.

13      Q.   This is a document you've seen before,

14  though.  Right?

15      A.   Yes.

16      Q.   If you could turn to the fifth page of the

17  document where it says Polaroid Retiree Medical.  Do

18  you see that?

19      A.   Yes.

20      Q.   Prior to October 9, 2001, what were the

21  benefits that Polaroid provided its retirees,

22  medical benefits?

23      A.   It offered retirees the opportunity to

24  participate in the Polaroid medical plans for those

10

1    between 55 and 65 and it provided an eligibility in

2    supplemental plans for those over 65.

3         Q.    And did Polaroid provide any funding for

4    those retirees as it related to their participation

5    in those plans?

6         A.    Yes.

7         Q.    And do you recall what the funding levels

8    were that Polaroid provided to retirees between the

9    ages of 55 and 65?

10        A.    In what time frame?

11        Q.    Prior to October; the period immediately

12   prior to October 9, 2001.

13        A.    I believe the company provided a 50

14   percent subsidy for retiree medical benefits.

15        Q.    And when you say a 50 percent subsidy,

16   what do you mean by that?

17        A.    The company contributed 50 percent of the

18   cost of retiree health coverage and the participant

19   retiree paid the other 50 percent.

20        Q.    And how about with respect to retirees

21   over the age of 65?  Did Polaroid provide any

22   subsidy?

23        A.    My understanding is it was the same

24   subsidy.

11

1      Q.   On the document with the Bates stamp

2    PRD-EC-001138, which is part of Exhibit 1, there's a

3    reference to annual company cash.  Do you see that,

4    for 2001?  You see that?

5      A.   Yes.

6      Q.   What do you understand that to refer to?

7           MR. GALARDI:  I'm sorry.  Could you just

8    tell me what page you're referring to?

9           MR. GREENBERG:  Page 5 of Exhibit 1.

10   BY MR. GREENBERG:

11     Q.   Under the entry annual company cash

12   there's some amounts there.  What do you understand

13   that to refer to?

14     A.   I'm sorry.  I lost the thread.  Ask me the

15   question again, please.

16     Q.   The medical program for retirees, what was

17   the cost to Polaroid to fund that medical program on

18   an annual basis prior to the termination?

19     A.   My understanding was it was approximately

20   $15 million.

21     Q.   Now, the committee that you were chairman

22   of, did it have any involvement in calendar 2001 in

23   considering Polaroid retiree medical benefits?

24     A.   Not that I'm aware of.

12

1     Q.   Did you in any capacity at Polaroid have
2     any involvement in calendar 2001 in consideration of
3     Polaroid retiree medical benefits?
4          A.   Yes.
5          Q.   And when did you have first involvement in
6     that subject?
7          A.   I can't place the timing.  Sometime in
8     2001 there were discussions about reducing the cost
9     of medical benefits.
10         Q.   What season was that?
11         A.   I'm not sure when those discussions
12    started.
13         Q.   Was it prior to you becoming chairman of
14    the -- What was the name of the committee you were
15    chairman of?
16         A.   Plan administrator.
17         Q.   Plan administrator.  Was it prior to you
18    becoming chairman of the plan administrator?
19         A.   I believe it was.
20         Q.   And what was your role in those
21    discussions?
22         A.   I recall senior management discussions
23    about ways to reduce costs in general, and one of
24    those discussions focused on the cost of benefits.

13

1      Q.    Was this a board meeting where it was

2   discussed?

3      A.    I wasn't referring to a board meeting.  I

4   was referring to an executive committee meeting.

5      Q.    When you say an executive committee

6   meeting, who attended that meeting?

7      A.    These were senior management meetings that

8   were held by the CEO, CFO, general counsel, senior

9   vice president of global operations, senior vice

10  president research and development.

11     Q.    And one of the topics that was discussed

12  was the cost of providing medical insurance to

13  retirees.  Is that correct?

14     A.    Yes.

15     Q.    And this was a meeting that took place

16  sometime prior to July of 2001?

17     A.    I believe it did.

18     Q.    Did the subject of the possibility of

19  eliminating those benefits come up at that time?

20     A.    I believe it did.

21     Q.    Who raised that subject?

22     A.    I don't recall who raised the subject.

23     Q.    What was discussed on that subject, the

24  subject of the possibility of eliminating retiree

14

1    medical benefits?

2        A.    I don't recall exactly.  I think it was

3    proposed as the benefit and the cost of providing

4    the benefit, along with other items that were put

5    up.

6        Q.    Well, did someone raise the possibility

7    that maybe we should eliminate these retiree medical

8    benefits in total?

9        A.    No.  Not the way you posed that question,

10   no.

11       Q.    What was said on that subject?

12       A.    As I recall, data was produced that showed

13   the cost of various portions of the benefits that

14   Polaroid provided.

15       Q.    And the data would have included that it

16   was costing Polaroid approximately $15 million

17   during calendar 2001 for retiree medical benefits.

18   Is that correct?

19            MR. SAUNDERS:  Objection to the form of

20   the question.

21       A.    I don't recall the number that was put up

22   at the time of that discussion.

23       Q.    But there was a number that was put up

24   which indicated the cost to Polaroid of providing

15

1    medical benefits to retirees.  Correct?

2        A.    Yes.

3        Q.    Was there a discussion about the

4    possibility that Polaroid might eliminate that

5    benefit as a cost-saving device?

6        A.    At what point in time?

7        Q.    At the point of this meeting that took

8    place, this executive committee meeting sometime

9    prior to July of 2001.

10       A.    I don't recall.

11       Q.    Well, what do you recall being said on

12   that subject?

13       A.    I recall that the costs of certain

14   benefits were presented.  I don't recall specific

15   discussion about terminating the benefits.

16       Q.    When you say certain benefits, are you

17   talking about retiree benefits?

18       A.    The discussion was not focused entirely on

19   retiree benefits.  We talked about retiree benefits,

20   talked about current employee benefits.  It was a

21   review of benefit programs and costs.

22       Q.    Did the review include a review of retiree

23   benefits?

24       A.    I believe it did.

1    Q.    Were there minutes taken of these

2    meetings?  Does the executive committee take minutes

3    of its meetings?

4    A.    No.

5    Q.    Was there a written presentation of any

6    data at that meeting?

7    A.    There may have been.  I don't recall.

8    Q.    And other than recalling that this took

9    place sometime prior to July of 2001, you can't be

10   any more specific about when this subject came up?

11   MR. SAUNDERS:  Object to the form of the

12   question.

13   A.    I don't recall when that meeting took

14   place.

15   Q.    Was it your impression or understanding at

16   the time of this meeting that one of the subjects

17   that Polaroid was looking at was the possibility of

18   eliminating retiree medical benefits?

19   A.    No.

20   Q.    What did you understand then was the

21   purpose of reviewing this data as it related to

22   retiree medical benefits?

23   A.    To understand the costs and to help the

24   company develop a budget for the year and determine

17

1    what if any changes would be made to benefits.

2        Q.    And when you say help the company develop

3    a budget for the year, what year are you talking

4    about?

5        A.    2001.

6        Q.    2001 fiscal year or calendar year or is

7    there a difference?  Strike that.

8        A.    The same.

9        Q.    The same.  So this meeting took place

10   sometime prior to the establishment of the 2001

11   budget.  Is that right?

12       A.    Probably.  I can't place it.  Probably.

13       Q.    And Polaroid in its normal operations,

14   when would it be establishing the next year's

15   budget?

16       A.    Sometimes it's after the beginning of the

17   year they get finalized, so it could have been after

18   the first of the year; it could have been late in

19   the year before.

20       Q.    Is it a fair statement, an accurate

21   statement that you believe this meeting would have

22   taken place either in the last quarter of 2000 or

23   the first quarter of 2001, in that six-month window?

24       A.    Yes.

18

1    Q.    Was there a budget that Polaroid in fact

2    approved for calendar 2001?

3    A.    Yes.

4    Q.    And that budget was to carry right till

5    the end of 2001; in other words, December 31, 2001.

6    Right? I'll rephrase the question. You said before

7    that Polaroid establishes an annual budget. Is that

8    right?

9    A.    Yes.

10    Q.    And by an annual budget, you mean a budget

11    that will last for a calendar year. Right?

12    A.    Yes.

13    Q.    And did Polaroid establish an annual

14    budget for calendar year 2001?

15    A.    Yes.

16    Q.    And did that annual budget have a

17    calculation as far as retiree benefits?

18    A.    Yes.

19    Q.    Do you recall approximately the amount

20    that was calculated for retiree benefits for

21    Polaroid's calendar 2001?

22    A.    No. I don't think I would have seen it as

23    a line item.

24    Q.    But just so I'm clear, the budget for 2001

1    didn't calculate retiree benefits for nine months,

2    did it?  It calculated them assuming they were going

3    to get them for twelve months.  Isn't that right?

4        A.    I believe that's correct.

5        Q.    Now, does Polaroid publicize in any way

6    its annual budget?

7        A.    I don't know what you mean, publicize.

8        Q.    Well, does it put it in any SEC filings?

9    Does it announce to its employees that we've

10   approved the budget for the calendar year?

11       A.    We wouldn't file it with the SEC.  We

12   might have -- I don't recall -- we might have

13   presented some yearly targets to employees.  I don't

14   recall.

15       Q.    Now, when you say yearly targets, that's

16   projected income and expenses.  Right?

17       A.    Yes.

18       Q.    You would agree with the statement that

19   Polaroid's budget for calendar 2001 when it was

20   approved included as an expense Polaroid retiree

21   medical benefits for the entire calendar year?

22       A.    I don't know that as a fact.  I didn't

23   develop the budget.

24       Q.    Well, sir, do you have any reason to

1   believe that it didn't include retiree medical
2   benefits as a cost item for the entire twelve-month
3   period?

4              MR. SAUNDERS:  Object to the form of the
5   question.

6        A.    No.

7        Q.    Now, at any point in time did you hear
8   anyone to your knowledge at Polaroid prior to the
9   end of September 2001 announce that Polaroid had
10  adopted a revised operating budget for calendar 2001
11  that reflected less money -- I'm sorry -- reflected
12  an elimination of retiree medical benefits for the
13  last quarter?

14       A.    I'm sorry.  Could you repeat that?

15       Q.    Bad question.  Let me rephrase it.

16             At any point in the first nine months of
17  calendar 2001, are you aware of Polaroid announcing
18  that it had revised its calendar-year budget to
19  reflect the elimination of retiree medical payments
20  for the last quarter?  And I'm just focusing on the
21  first nine months.

22       A.    No.

23       Q.    Now, in the first six months of calendar
24  2001 did you have any other discussions with anyone

27

1   at Polaroid about the possibility of eliminating

2   Polaroid retiree medical payments?

3        A.    I don't recall.

4        Q.    When is the first discussion you recall

5   about the possibility of eliminating Polaroid

6   retiree medical payments?

7        A.    Sometime early in the summer of 2001.

8        Q.    And in what context was that discussion?

9        A.    We were reviewing the cost of medical

10  benefits; we were reducing the subsidy for the

11  company contribution to the employee plan, the

12  employee medical benefits.  And at that time we were

13  looking at the cost of retiree benefits and there

14  was a discussion about whether or not to eliminate

15  retiree medical coverage or reduce the subsidy to

16  retirees.

17       Q.    Was this a management discussion, a board

18  discussion?  What context?

19       A.    I'm referring to a management discussion.

20       Q.    This was in executive committee?

21       A.    I don't remember if it was in executive

22  committee or a smaller meeting.  I just have a

23  recollection of the discussion in general terms.

24       Q.    Being in the early summer of 2001?

1      A.    Yes.

2      Q.    Who do you recall discussing it with?

3      A.    I believe I had discussions with Bill

4  Flaherty.

5      Q.    Mr. Flaherty holds what position?

6      A.    Chief financial officer.

7      Q.    And he held that position at the time?

8      A.    I think he had just joined us.

9      Q.    Who else?

10     A.    Gary DiCamillo, CEO.  These may have been

11  different conversations.  I'm not suggesting this

12  was one meeting.  Louise Cavanaugh.

13     Q.    What position?

14     A.    Louise is associate general counsel.  Mary

15  Kelly.

16     Q.    And what position does she hold?

17     A.    At that time she was manager of

18  compensation and benefits.  That's what I recall.

19     Q.    Who raised the possibility of eliminating

20  retiree medical benefits payments by Polaroid?

21     A.    I don't recall who raised it, but Mary

22  Kelly was -- I don't recall who raised it.

23     Q.    Well, you didn't raise it.  Right?  That

24  wasn't your idea?

23

1      A.    I'm not suggesting it was anybody's idea.

2    The company was examining ways to reduce costs.

3      Q.    Were there any written documents that

4    reflected that consideration of eliminating retiree

5    medical payments?

6      A.    I don't recall if there were documents

7    specific to that.

8      Q.    Were there discussions about the pros and

9    cons of eliminating medical benefits for retirees?

10     A.    I don't recall a discussion of the pros

11   and cons.

12     Q.    Well, what do you recall Mr. Flaherty said

13   on the subject?

14     A.    We were examining the cost impact of these

15   benefits and whether or not we could afford to

16   continue them.

17     Q.    Did Mr. Flaherty make any recommendation?

18     A.    I don't recall a specific recommendation.

19   I recall discussions.

20     Q.    Well, do you recall generally what he said

21   on that subject?  Other than going through the

22   numbers and saying what it cost, do you recall

23   anything that Mr. Flaherty said about whether this

24   was a good idea or a bad idea, to eliminate these

1    benefits?

2          A.    No, I don't.

3          Q.    Is it that you don't recall or he didn't

4    make any comment on that subject?

5          A.    I don't recall what he said.

6          Q.    How about Mr. DiCamillo? Did he say

7    anything on this subject of eliminating retiree

8    benefits?

9          A.    Yeah, he very much wanted to find a way

10    not to eliminate the retiree medical benefits.

11          Q.    He told you that?

12          A.    Yes.

13          Q.    This is back in the early summer of 2001?

14          A.    Yes.

15          Q.    Did he say why he very much wanted to find

16    a way not to eliminate these retiree benefits?

17          A.    Because he felt that the retirees were

18    former employees and he was sympathetic to their

19    financial needs.

20          Q.    Did he ever use the word that these were

21    benefits that had been promised these people?

22          A.    No, not to my knowledge.

23          Q.    Did he ever indicate to you that he

24    thought these retirees were in a vulnerable

1   Q.   When did she give this advice?

2   A.   On an ongoing basis.

3   Q.   Well, when was the initial time she gave

4   advice?

5   A.   I don't recall specifically.

6   Q.   Was it sometime early summer of 2001?

7   A.   I believe it was.

8   Q.   So if I understand, Ms. Cavanaugh gave

9   advice in early summer of 2001 on the issue of

10  whether or not Polaroid could eliminate retiree

11  benefits.  Is that right?

12  A.   I don't think that's what I said.

13  Q.   Well, what was the subject that she was

14  giving advice on in the early summer of 2001 as it

15  related to retirees?

16       MR. SAUNDERS:  Just so you understand, you

17  can disclose the subject matter generally of matters

18  on which you received advice but you should not

19  disclose the substance of the advice.  Do you

20  understand that?

21       THE WITNESS:  Yes.

22  A.   She advised as to Polaroid's rights and

23  responsibilities under the medical plans in effect.

24  Q.   Was one of the subjects that she gave

1    advice on the subject of whether or not Polaroid in

2    her view could terminate the retiree medical

3    payments?

4            MR. SAUNDERS:  Answer that yes or no or "I

5    don't know" or "I don't recall."

6        A.    Yes.

7        Q.    And she gave that advice in the early

8    summer on that subject?

9        A.    I believe so.

10       Q.    So if I understand it, as early as the

11   summer of 2001 Polaroid was asking its in-house

12   counsel whether or not it had the ability legally to

13   terminate these benefits?

14           MR. SAUNDERS:  Instruction not to answer.

15   BY MR. GREENBERG:

16       Q.    Did Polaroid ever advise its retirees that

17   in the early summer of 2001 its counsel was

18   considering whether or not it had the right to

19   terminate these retirement plans?

20       A.    First of all, what you've just stated is

21   not what I stated.  I never said that we asked for

22   advice on terminating the medical plan.

23       Q.    Was Ms. Cavanaugh given the assignment to

24   determine whether or not Polaroid could terminate

1   the retiree benefits?

2           MR. SAUNDERS:  Instruction not to answer.

3   BY MR. GREENBERG:

4       Q.   What was the advice Ms. Cavanaugh provided

5   in the early summer of 2001?

6           MR. SAUNDERS:  Instruction not to answer.

7           MR. GREENBERG:  Just so it's clear, it

8   would be our position that we could argue negative

9   inference; that to the extent you assert privilege,

10  that the response would be something that would be

11  detrimental to your interests.  I just want to put

12  that on the record, that that may in fact be our

13  argument.

14          MR. SAUNDERS:  Well, good luck with it.

15  The privilege would be pretty useless if a negative

16  inference could be drawn from its assertion.  And

17  it's a pretty clear principle of law.  Although I'll

18  remember that next time I'm advising a client to

19  assert the privilege.

20  BY MR. GREENBERG:

21      Q.   Mr. Goldman, other than what you claim are

22  privileged discussions, did Ms. Cavanaugh say

23  anything to you or other members of Polaroid

24  concerning her views on the elimination of retiree

1    medical plans?

2            MR. SAUNDERS:  Can you read that back,

3    please.

4            (The reporter read the question.)

5            MR. SAUNDERS:  I guess I will repeat my

6    instruction to you, that if there's something that

7    you think was said which did not constitute a

8    rendition of legal advice or a communication that

9    was made to facilitate the rendition of legal

10    advice, then you can try to answer.

11        A.    I don't know.

12        Q.    You can't recall any?

13        A.    You asked me if she made statements to me

14    or anyone else.  I don't know about statements to

15    anyone else.

16        Q.    How about to you or where you were

17    present, in your presence?

18            MR. SAUNDERS:  You have my continuing

19    instruction in mind?

20            THE WITNESS:  Yes.

21        A.    No.

22        Q.    Mary Kelly, did she say anything in your

23    presence concerning the subject of the possibility

24    of eliminating retiree benefits as of early summer

31

1    2001?

2        A.    My recollection is she only produced

3    factual data.

4        Q.    Now, the document in front of you is

5    entitled Polaroid Benefit Plans 2001.  Do you see

6    that?

7        A.    Yes.

8        Q.    Looking at the document, do you have any

9    idea as to when this may have been prepared?

10       A.    No.

11       Q.    If you can turn to it, I asked you to look

12    at page 5; now let me ask you to look at page 6.

13    You see at the top it says Retiree Medical - Future

14    and there's a reference under Additional Options,

15    you see number 1, "Provide coverage for over 65

16    only, eliminate 55 to 65 coverage."  Do you see

17    that?

18       A.    Yes.

19       Q.    Was that a subject that you recall any

20    discussion on, the elimination of coverage for ages

21    55 to 65?

22       A.    I have a vague memory of alternatives

23    being discussed.

24       Q.    At what point in time?

1        A.    Summer of 2001.

2        Q.    Are these in the same context of the other

3    discussions you've talked about?

4              MR. SAUNDERS:  Object to the form of the

5    question.

6        A.    I'm not sure what you're referring to in

7    terms of the same discussions.

8        Q.    Is there something at Polaroid called the

9    human resources committee of the board of directors?

10       A.    Yes.

11       Q.    What is that?

12       A.    It's a subcommittee of the board of

13   directors which focuses on issues affecting human

14   resources and benefits.

15             MR. GREENBERG:  Let me mark, if I can, a

16   document that was produced in this matter by I

17   believe Polaroid's counsel.  It is a redacted

18   document, minutes of human resources committee of

19   the board of directors of Polaroid Corporation, July

20   3, 2001.  I'm just going to mark pages 1, 2 and 4 as

21   the exhibit.

22             (Goldman Deposition Exhibit 2 marked for

23   identification.)

24   BY MR. GREENBERG:

23

1      Q.    I'm going to show you what's been marked

2  as Exhibit 2, minutes of the human resources

3  committee.  Actually, let me ask you to identify

4  Exhibit 2.  What is it?

5      A.    Minutes of human resources committee

6  meeting of the Polaroid board of directors dated

7  July 3, 2001.

8      Q.    Now, it references a telephonic meeting of

9  the human resources committee of the board held on

10  July 3, 2001, and it lists participation in the call

11  of the following directors:  a Mr. Loose.  Who is

12  John Loose?

13      A.    John Loose is a Polaroid director.

14      Q.    Is he an employee of Polaroid?

15      A.    No.

16      Q.    An outside director?

17      A.    Yes.

18      Q.    Stephen Kaufman, who is Mr. Kaufman?

19      A.    He is an outside director.

20      Q.    Alfred Poe, who is he?

21      A.    He's an outside director.

22      Q.    And Alfred Zeien?

23      A.    He's an outside director.

24      Q.    And were they outside directors of

34

1      Polaroid as of July 3, 2001?

2          A.    Yes.

3          Q.    Are they still directors of Polaroid?

4          A.    Yes.

5          Q.    Were they also on the human resources

6      committee of the Polaroid board of directors as of

7      July 3, 2001?

8          A.    Yes.

9          Q.    Were you on that committee, the human

10     resources committee of the board of directors, as of

11     July 3, 2001?

12         A.    No.

13         Q.    Were there any other people on that

14     committee, the human resources committee?

15         A.    I think there's one other -- I believe

16     there is one other committee member and I can't

17     think offhand who it is, also an outside director.

18         Q.    And it also references --

19         A.    I'm sorry.  It references all members of

20     the committee.  This is the entire committee.

21         Q.    Those four people?

22         A.    Yes.

23         Q.    Prior to July 3, 2001, had you had any

24     discussions with either Mr. Loose, Mr. Kaufman,

1   Mr. Poe or Mr. Zeien about the possibility of

2   eliminating retiree medical benefit payments?

3       A.   I don't believe so.

4       Q.   Is this July 3rd the first time this

5   subject was discussed with those gentlemen?

6       A.   What subject?

7       Q.   The reduction or elimination of retiree

8   medical benefits.

9       A.   Is there a reference in here to retiree

10  medical benefits?

11      Q.   The second page, "Mr. Greenberg reported

12  on proposed employee and retiree benefit changes."

13      A.   Right.  I believe it was.

14      Q.   This is the first time you discussed the

15  possibility of eliminating the retiree benefits with

16  these four people?

17      A.   I'm sorry.  You first asked me whether or

18  not this was the first time we talked about changes

19  to retiree benefits and now you've just said the

20  first time we talked about eliminating them.  I

21  don't think we've established that we talked about

22  eliminating benefits at this meeting.

23      Q.   You testified before that prior to July of

24  2001 you had discussed with executives at Polaroid

26

1    one possibility being eliminating these benefits,

2    retiree benefits.  Isn't that correct?

3        A.    Yes.

4        Q.    Now, Harvey Greenberg, it says here in

5    Exhibit 2 he was a consultant.  Did Mr. Greenberg

6    work at any point in time for Polaroid?

7        A.    Yes.

8        Q.    In what capacity?

9        A.    At any point in time?

10       Q.    Was he an employee of Polaroid during

11   calendar 2001?

12       A.    Yes.

13       Q.    What was his position?

14       A.    Senior vice president human resources.

15       Q.    Did that position have any responsibility

16   as it related to Polaroid retiree benefits?

17       A.    Yes.

18       Q.    Mr. Greenberg resigned from Polaroid

19   sometime prior to July 3, 2001.  Is that correct?

20       A.    Yes.

21       Q.    Why did he resign, if you know?

22       A.    I don't know.

23       Q.    You don't know.  He was given a severance

24   package, is that right, when he resigned?

1    A.    Yes.

2    Q.    And he was also hired back by Polaroid as

3    a consultant.  Is that right?

4    A.    Yes.

5    Q.    Did Mr. Greenberg take a lump-sum pension

6    payout at the time of his resignation?

7    A.    I believe he did.

8    Q.    Do you recall the magnitude of his payout?

9    A.    Hundreds of thousands of dollars.  I don't

10   remember the exact number.

11   Q.    What was Mr. Greenberg's salary at

12   Polaroid prior to his resignation and coming on as a

13   consultant?

14   A.    I'm not sure.  260, 280.

15   Q.    So he was making a little less than

16   300,000?  Less than 300,000 dollars a year.  Is that

17   right?

18   A.    Yes.

19   Q.    And he was given a severance package.

20   Right?

21   A.    Yes.

22   Q.    And that severance package, do you recall

23   the magnitude of the money he was getting under that

24   severance agreement?

38

1     A.    I believe it was a two-year severance paid

2   in a stream of payments, I believe.

3     Q.    A stream of payments over two years?

4     A.    I believe, yes.

5     Q.    And he was also hired as a consultant?

6     A.    Yes.

7     Q.    Was he getting paid as a consultant?

8     A.    Yes.

9     Q.    Do you recall approximately how much he

10  was being paid as a consultant?

11    A.    I don't offhand.

12    Q.    Was it $22,500 a month?  Does that sound

13  about right?

14    A.    That sounds about right.

15    Q.    So why did Polaroid hire -- Why did

16  Polaroid agree to pay Mr. Greenberg a severance

17  payment over a two-year period and then hire him as

18  a consultant at $22,500 a month?

19    A.    We hired him as a consultant.  I don't

20  remember the term of his consulting agreement but I

21  believe it was fairly short, and we believed we

22  needed some transitional consulting advice after the

23  11.

24    Q.    On what subject was he hired to be a

39

1    consultant?

2          A.   Some human resources issues.

3          Q.   What issues?

4          A.   He was helping us on some compensation and

5    benefits work.

6          Q.   Anything as it related to retirees?

7          A.   I don't know.

8          Q.   Did he have a written consulting

9    agreement?

10         A.   Yes.

11         Q.   How long was it to run?

12         A.   I don't recall.

13         Q.   Was it more than six months?

14         A.   I don't think so.

15         Q.   Has Mr. Greenberg been retained in

16   connection with the bankruptcy proceeding?

17         A.   No.

18         Q.   So does Mr. Greenberg have any ongoing

19   relationship with Polaroid since it filed its

20   bankruptcy proceeding, other than as a creditor?

21         A.   I don't know.  I don't know when his

22   consulting agreement ran out.  I don't know if it

23   was -- I don't know if he did any work after the

24   petition was filed.

46

1      Q.    Now, it says in Exhibit 2 that
2  Mr. Greenberg on page 2 reported on proposed
3  employee and retiree benefit changes.  Do you see
4  that?
5      A.    Yes.
6      Q.    Was Mr. Greenberg given an assignment by
7  Polaroid as it related to retiree benefits?
8      A.    My recollection is that he was asked to
9  make this report, because I had just taken over
10  responsibility from him for human resources and
11  where he had done a lot of the prior work, he was
12  asked to make this presentation.  I hadn't been in
13  the job very long.
14      Q.    Who asked him to make this report?
15      A.    I believe Gary DiCamillo asked him.
16      Q.    And when was that request made of Harvey
17  Greenberg?
18      A.    I don't know.
19      Q.    Was it made more than a month before this
20  meeting?
21      A.    I don't know.
22      Q.    What did Mr. DiCamillo ask Mr. Greenberg
23  to do?
24      A.    I don't know.

1      Q.    What was your understanding based upon

2   your position at the company and as a member and

3   participating in this meeting as to what

4   Mr. Greenberg had been asked to do?

5      A.    Mr. Greenberg had been working on benefit

6   changes while he was an employee.  My understanding

7   was that he was asked to continue to manage the work

8   he was doing and to make this presentation to the

9   board, because it was very soon after he left the

10  company.

11     Q.    When you say make this presentation, did

12  Mr. Greenberg make a recommendation at this time as

13  it related to retiree benefits?

14     A.    Yes.

15     Q.    What was his recommendation as it relates

16  to retirees?

17     A.    I don't recall specifically.

18     Q.    Well, what do you recall generally his

19  recommendation was?

20     A.    I believe -- I don't recall specifically.

21  I don't.

22     Q.    What do you recall on the subject of his

23  recommendation?

24     A.    I don't recall.

42

1      Q.    Did he recommend that Polaroid eliminate

2    retiree benefits?

3      A.    I have no recollection of him making that

4    recommendation.

5      Q.    Was that discussed at this meeting, this

6    telephonic meeting on July 3?

7      A.    Not to my recollection.

8      Q.    Was his recommendation in writing?

9      A.    It was a telephone meeting.  I don't know

10   -- I don't recall if anything was circulated to the

11   board.

12     Q.    Was Mr. Greenberg on the phone and you

13   were in a separate facility on the phone or was he

14   with you and Mr. DiCamillo?

15     A.    I believe we were together in Cambridge.

16     Q.    When you say "we," you and --

17     A.    I believe Mr. DiCamillo and I and

18   Mr. Greenberg were together in Cambridge.  I

19   believe.

20     Q.    Do you recall anything that was said by

21   any of the participants in that meeting on July 3 on

22   the subject of retiree benefit changes?

23     A.    I don't.

24     Q.    Did you take any notes of the meeting?

48

1       A.    Yes.

2       Q.    Do you know whether or not those notes

3   have been -- Did you retain those notes?

4       A.    No.

5       Q.    When did you discard those notes?

6       A.    After I do the minutes, I write the

7   minutes and I discard the notes.

8       Q.    And Exhibit 2 reflects the minutes that

9   you prepared?

10      A.    I can't tell if there's a redaction, but

11  yes.

12      Q.    Have you ever received any written

13  proposal or recommendation from Mr. Greenberg as it

14  related to retiree benefit changes?

15      A.    I don't recall a recommendation from him

16  on retiree medical benefits.

17      Q.    Have you ever received any recommendation

18  from anyone at Polaroid between July 3, 2001, and

19  the bankruptcy filing concerning a recommendation to

20  change or eliminate retiree benefits?

21      A.    Will you repeat the question?

22            (The reporter read the question.)

23      A.    I don't recall the time frame.  There was

24  a time when we reduced the subsidy for retirees from

44

1    80 percent to 50 percent, and that may have been

2    based on a recommendation made; I don't recall.

3       Q.    Do you recall when that subsidy was

4    reduced?

5       A.    Again, the summer of 2001 it was

6    discussed.

7       Q.    When was it adopted?

8       A.    I don't know the specific -- I don't

9    recall the specific date.

10      Q.    How did you inform retirees of that

11   reduction in the subsidy?

12      A.    I believe there was a mailing of the

13   change.

14      Q.    To whom?

15      A.    To the retirees.

16      Q.    Did the mailing provide advance notice, in

17   other words, tell retirees that starting at some

18   point in the future this subsidy would change?

19      A.    I believe it did.

20      Q.    How much advance notice did it provide?

21      A.    I don't recall specifically.

22      Q.    Who was the author of that document?

23      A.    I don't know who wrote it.

24      Q.    Did you sign the letter?

45

1    A.    I'm not sure.

2        MR. GREENBERG:  Has that document been

3    produced?

4        MR. GALARDI:  I don't know.

5    BY MR. GREENBERG:

6    Q.    Now, you said there was a change in the

7    subsidy.  Was there an amendment to the plan

8    documents to reflect that reduction in the subsidy?

9    A.    I don't know.

10   Q.    Well, you were chairman of the plan

11   committee.  Right?

12   A.    Yes.

13   Q.    Do you know what the word fiduciary is?

14   A.    Yes.

15   Q.    Did you view yourself as a fiduciary in

16   that position?

17   A.    Yes.

18   Q.    And what did you understand as a fiduciary

19   your responsibilities were?

20   A.    My responsibilities were to carry out the

21   plan for the benefit of the participants in the

22   plan.

23   Q.    The participants being the retirees.  Is

24   that correct?

46

1    A.    And employees, yes.

2    Q.    I'm only focusing on retirees.  Did you

3  understand that you were a fiduciary for retirees?

4    A.    Yes.

5    Q.    And you understood that from the time that

6  you ascended to that position in the summer of 2001.

7  Is that right?

8    A.    Yes.

9    Q.    As a fiduciary as the chairman of that

10  committee, did you seek advice from anyone on what

11  your duties and responsibilities were?

12    A.    Yes.

13    Q.    And from whom did you seek advice on that

14  subject?

15    A.    Louise Cavanaugh.

16    Q.    But I thought you said Ms. Cavanaugh was

17  employed by Polaroid.

18    A.    She is.

19    Q.    Well, you wore one hat as the general

20  counsel and employee of Polaroid and you wore

21  another hat as chairman of the plan fiduciary.  Is

22  that right?

23          MR. SAUNDERS:  Object to the form of the

24  question.

47

1    BY MR. GRAY:

2        Q.    Is that right?

3        A.    Repeat the question, please.

4        Q.    You acted both as a general counsel and

5    employee of Polaroid and at the same time you were a

6    fiduciary to the retirees as chairman of the plan

7    committee.  Is that right?

8        A.    Yes.

9        Q.    Now, did Ms. Cavanaugh act as counsel to

10   the plan or was she -- ?  Did she act as counsel to

11   the plan?

12       A.    She advised the committee with outside

13   advice.

14       Q.    When you say outside advice, did the

15   committee -- And when I say the plan, I'm talking

16   about the plan to provide retirees with benefits.

17   Did that plan retain outside counsel who gave it

18   advice?

19              MR. SAUNDERS:  Object to the form of the

20   question.

21       A.    Are you talking about the plan

22   administrator?

23       Q.    Yes.  Did you retain outside counsel,

24   someone other than Ms. Cavanaugh, to give you advice

48

1    on what you could do and couldn't do?

2         A.    The plan administrator was receiving

3    outside advice, yes.

4         Q.    From whom?

5         A.    We had advice coming I believe from Groom

6    & Associates and also from Baker & Botts.

7         Q.    And, I'm sorry, the first company was

8    what?

9         A.    Groom & Associates.

10        Q.    What are they?

11        A.    They are a law firm specializing in

12   benefits.

13        Q.    Where are they located?

14        A.    Washington.

15        Q.    Did you deal with someone in particular

16   there?

17        A.    We dealt with Bob Gallagher and Gary

18   Groom.

19        Q.    Is that the --

20        A.    Gary Ford.

21        Q.    Is that called the Groom Law Group,

22   Chartered?

23        A.    Yes.
24        Q.    On Pennsylvania Avenue, Washington, D.C.?

49

1    A.   Yes.

2    Q.   And if I understand, they acted as your

3    counsel in giving you advice with respect to your

4    fiduciary obligations to retirees.  Is that a

5    subject you consulted them on?

6    A.   I don't recall specifically.

7    Q.   Well, did you consult anyone on that

8    subject, your fiduciary duties as the plan

9    administrator to retirees?

10    A.   Yes.

11    Q.   Who paid the Groom Law Group fees?

12    A.   The company.

13    Q.   Which company?

14    A.   Polaroid.

15    Q.   Now, you also said Baker & Botts.  Did you

16    also consult with them on that subject, the subject

17    of your fiduciary duties as plan administrator to

18    retirees?

19    A.   I'm not sure if we consulted with them on

20    fiduciary duties.

21    Q.   Who at Baker & Botts -- Are you familiar

22    with a gentleman, James Raborn?

23    A.   No.
24    Q.   Could you just explain why is it that

50

1      Polaroid paid the Groom law firm fees for advice it

2      gave you as plan administrator?

3                  MR. SAUNDERS:  Object to the form of the

4      question.

5           A.    We thought it was appropriate for the

6      company to pay that.

7           Q.    When you say "we," who is the we?

8           A.    The company, Polaroid.

9           Q.    Did you consult with the Groom Law Group

10     in connection with the attempt or the purported

11     termination of the retiree plan?

12          A.    I'm not sure.  What purported termination

13     of the retiree plan?

14          Q.    Does Polaroid claim that it terminated the

15     retiree medical plan?

16          A.    I'm sorry.  I thought you said --

17          Q.    At any point in time did Polaroid

18     terminate its medical benefits for retirees?

19          A.    Yes.

20          Q.    And in your capacity as plan

21     administrator, did you consult with the Groom Law

22     Group on that subject?

23          A.    I don't recall.

24          Q.    Well, did you consult with anyone on that

51

1   subject, any lawyers?

2        A.   Did the plan administrator consult with

3   any lawyers?

4        Q.   Well, you were the plan administrator.

5   Right?

6        A.   I just want to be clear.

7        Q.   And I just want to be clear too.  You were

8   the plan administrator?

9        A.   Yes.

10       Q.   You were a fiduciary to all the retirees,

11  the plan participants.  Right?

12       A.   Repeat the question again, please.

13       Q.   Did you understand that you were a

14  fiduciary to the retirees, Polaroid's retirees?

15       A.   Yes.

16       Q.   And if I understand, as the plan

17  administrator you took some action attempting to

18  terminate the plan.

19       A.   The plan administrator doesn't terminate

20  the plan.

21       Q.   Did you take any action to terminate the

22  plan?

23       A.   Did I personally?

24       Q.   Yes, in your role as plan administrator.

57

1    A.    The plan administrator did not terminate

2    retiree medical.

3    Q.    Who terminated the retiree medical?

4    A.    The board of directors.

5    Q.    Of Polaroid?

6    A.    Yes.

7    Q.    Did they consult with you before they did

8    that?

9    A.    Yes.

10    Q.    In your capacity as a member of the board

11    of directors, did you consult with outside counsel

12    on that subject?

13    MR. SAUNDERS:  Object to the form of the

14    question.

15    A.    I am not a member of the board of

16    directors.

17    Q.    I'm sorry.  As general counsel.

18    A.    Repeat the question, please.

19    Q.    Did you consult with any outside law firm

20    on the subject of the board of directors' attempt to

21    terminate the plan, the retiree plan?

22    MR. SAUNDERS:  Object to the form of the

23    question.

24    A.    I don't understand the word attempt to

53

1    terminate.

2        Q.    Did you discuss with anyone -- I'll back

3    up.  Can you tell me why Groom Law Group was paid

4    $50,000 on October 4, 2001?

5        A.    Yes.

6        Q.    And what was that for?

7        A.    That was for legal advice.

8        Q.    In connection with what?

9        A.    The company's benefit plan.

10       Q.    Was that advice that had been rendered or

11   advice that was about to be rendered?

12       A.    I don't recall.

13       Q.    You approved that bill, though?

14       A.    Yes.

15       Q.    Now, between July 3 and the first week of

16   October -- Strike that.  After July 3, 2001, when

17   was the next time you participated in any

18   discussions concerning the possibility that the

19   retiree medical plan might be terminated?

20       A.    I don't recall.

21       Q.    When do you recall next participating in

22   any discussion on that subject?

23       A.    I'm sorry.  The subject of?
24       Q.    The possibility of eliminating retiree

54

1    medical benefits.

2        A.    I don't recall specifically.

3        Q.    Prior to the bankruptcy filing do you

4    recall having any discussion with anyone about the

5    possibility of terminating retiree benefits, between

6    July 3 and the bankruptcy filing?

7        A.    Yes.

8        Q.    With whom?

9        A.    Louise Cavanaugh.

10       Q.    Who else?

11       A.    Bill Flaherty.

12       Q.    Who else?

13       A.    Gary DiCamillo.

14       Q.    Who else?

15       A.    Mary Kelly, Gary Ford of Groom &

16   Associates, David Kurtz of Skadden Arps, Gregg

17   Galardi of Skadden Arps.

18       Q.    When was Skadden Arps retained?

19       A.    I'm not sure.  July-August, somewhere in

20   there.

21       Q.    Of what year?

22       A.    2001.

23            MR. SAUNDERS:  Can we take a break when
24   you get to a good stopping point?

55

1    BY MR. GREENBERG:

2        Q.    Was one of the reasons Skadden Arps was

3    retained to consider the possibility of a Chapter 11

4    filing?

5        A.    Repeat the question.

6        Q.    Was one of the reasons that Skadden Arps

7    was retained in terms of the consideration of a

8    possible Chapter 11 proceeding?

9            MR. SAUNDERS:   Object to the form of the

10   question.

11       A.    They were hired to advise us on

12   restructuring.

13       Q.    And did that include the possibility of a

14   Chapter 11 filing?

15       A.    Yes.

16       Q.    And you said they were retained sometime

17   around July or August?

18       A.    I believe.  I don't have the exact date.

19            MR. GREENBERG:  If you want to take a

20   break now, that's fine.

21            (In recess 10:58 a.m. to 11:08 a.m.)

22   BY MR. GREENBERG:

23       Q.    Prior to retaining Skadden, had Polaroid

24   retained anyone else to advise it on restructuring?

56

1    A.    Yes.

2    Q.    Who?

3    A.    Simpson Thacher.

4    Q.    Simpson Thacher in New York, the New York

5    office?

6    A.    Yes.

7    Q.    When did Polaroid retain Simpson Thacher

8    to provide it with restructuring advice?

9    A.    I don't recall the exact date.

10    Q.    Was it prior to the spring of 2001?

11    A.    It may have been the spring of 2001.

12    Q.    And did Polaroid have a preexisting

13    relationship with Simpson Thacher?

14    A.    Yes.

15    Q.    Was the subject of changing or eliminating

16    the retiree benefits discussed with Simpson Thacher

17    at any point in time?

18    A.    I don't recall.

19    Q.    Who had responsibility for interfacing

20    with Simpson Thacher, who at Polaroid, in connection

21    with getting any advice on eliminating or changing

22    retiree medical benefits?

23         MR. SAUNDERS:  Object to the form of the

24    question.

57

1      A.    I had responsibility for outside counsel.

2      Q.    Did you discuss with anyone at Simpson

3   Thacher whether or not Polaroid could terminate

4   retiree medical benefits?

5           MR. SAUNDERS:  You can answer that yes or

6   no, "I don't know" or "I don't recall."

7      A.    I don't recall specifically.

8      Q.    Did you discuss that subject with any

9   other outside counsel?

10     A.    At what point in time?

11     Q.    At any point in time; any point prior to

12  the bankruptcy filing.

13     A.    Yes.

14     Q.    With whom?

15     A.    Groom & Associates and Skadden Arps.

16     Q.    Who did you discuss it with first?

17     A.    I believe Skadden Arps.

18     Q.    And with whom at Skadden Arps?

19     A.    David Kurtz, I believe.

20     Q.    When was that?

21     A.    I don't recall the time.

22     Q.    What month?

23     A.    I don't recall the month.
24     Q.    Was it the summer of 2001?

58

1     A.   I don't know.  I don't think -- I don't

2  know.  Don't know.

3     Q.   What did you say to Mr. Kurtz and what did

4  he say to you on that subject?

5         MR. SAUNDERS:  Instruction not to answer.

6  BY MR. GREENBERG:

7     Q.   With whom at Groom Law Group did you

8  discuss that subject?

9     A.   Gary Ford.

10     Q.   And when was that discussion?

11     A.   I don't recall specifically.  I remember a

12  conversation; I don't know specifically.  I don't

13  recall specifically.

14     Q.   Do you recall providing to either the

15  Groom Law Group or Skadden Arps copies of your plan

16  documents?

17         MR. SAUNDERS:  Hold on a second.

18         THE WITNESS:  I'm sorry?

19         MR. SAUNDERS:  Hold on a second.  I'm

20  thinking about that.  I'm going to instruct you not

21  to answer that.

22  BY MR. GREENBERG:

23     Q.   Were you given any advice by the Groom Law

24  Group on the subject of whether or not Polaroid

59

1    could terminate its benefit plans for retirees?

2         MR. SAUNDERS:  Object to the form of the

3    question, but you can answer it yes, no, "I don't

4    know," "I don't recall."

5         A.   Yes.

6         Q.   And when were you given such advice?

7         A.   I don't recall the timing.

8         Q.   Was that advice in writing?

9         A.   I don't recall.

10        Q.   Do you recall approximately how much prior

11   to the bankruptcy filing you received that advice?

12        A.   I believe it was pretty close to the

13   filing.

14        Q.   And what was the information that you

15   received from the Groom Law Group?

16        MR. SAUNDERS:  Instruction not to answer.

17   BY MR. GREENBERG:

18        Q.   Did you receive advice from Skadden Arps

19   on whether or not Polaroid could terminate the

20   retirement plans for retirees?

21        MR. SAUNDERS:  Object to the form of the

22   question.  You can answer it yes, no, or "I don't

23   know," "I don't recall."

24        A.   Yes.

60

1     Q.    And was that advice in writing?

2     A.    I don't believe it was.

3     Q.    When did you receive that advice?

4     A.    I believe it was pretty close to the

5     filing date.

6     Q.    When you say pretty close, is that within

7     a matter of hours, days, weeks, what?

8     A.    Weeks, maybe days.

9     Q.    And what was that advice?

10          MR. SAUNDERS:  Objection, instruction not

11    to answer.

12    BY MR. GREENBERG:

13    Q.    Who was Polaroid's principal lender?

14    A.    Chase Manhattan Bank.

15    Q.    And prior to the bankruptcy filing, was

16    Chase Manhattan Bank the principal lender of

17    Polaroid's?

18    A.    Yes.

19    Q.    Did you speak with any representative of

20    Chase Manhattan Bank on the subject of reducing or

21    eliminating retiree benefits?

22    A.    No.

23    Q.    Did you attend any meeting where any
24    representatives of Chase Manhattan were present

66

1    where that subject arose?

2        A.    No.

3        Q.    Are you aware of any meeting that was

4    attended by Polaroid's counsel where that subject

5    arose?

6        A.    Repeat the question.

7        Q.    Are you aware of any meeting at which

8    Polaroid's counsel attended with representatives of

9    Chase Manhattan Bank where the subject of the

10   elimination of retiree benefits was discussed?

11       A.    What time frame?

12       Q.    Prior to the bankruptcy filing.

13       A.    No.

14       Q.    You're familiar with the terminology a DIP

15   budget?

16       A.    Yes.

17       Q.    Debtor-in-possession financing.  Is that

18   right?

19       A.    Yes.

20       Q.    Who at Polaroid or acting for Polaroid was

21   involved in preparing the DIP financing budget?

22       A.    I don't know the names of all of the

23   people who were involved.  It was under the

24   direction of our CFO, Bill Flaherty.

62

1    Q.    Were you involved in that process?

2    A.    Creating the budget?  What process?

3    Q.    The process of creating the budget.

4    A.    No.

5    Q.    Do you know when Mr. Flaherty started

6    working on -- Strike that.  Do you know when

7    Polaroid started working on creating a debtor-

8    in-possession financing budget?

9    A.    No.

10    Q.    Do you know who worked with Mr. Flaherty

11    on that subject?

12    A.    I know some of the people.  I may not know

13    all of them.  Andra Bolotin and Don Halstead.

14    Q.    What are their positions?

15    A.    Andra Bolotin is the treasurer and vice

16    president corporate strategy.  Don Halstead is the

17    vice president and controller.

18    Q.    What was their role, if you know, in

19    connection with preparing the DIP budget?

20    A.    Don Halstead was responsible for creating

21    the internal operating budgets and Andra Bolotin was

22    responsible for treasury and worked with Bill

23    Flaherty on the budgets.

24    Q.    Did Polaroid start preparing a proposed

63

1    DIP budget in the summer of 2001?

2         A.   I don't know.

3         Q.   Who would know that?

4         A.   I don't know who would know that.

5         Q.   Did your restructuring counsel at Simpson

6    Thacher and at Skadden Arps report to you on the

7    status of what they were doing?

8              MR. SAUNDERS:   Object to the form of the

9    question.

10        A.   What they were doing regarding what?

11        Q.   For example, your outside counsel, your

12   restructuring counsel, were they engaged in

13   discussions with your lender or your lender's

14   lawyers prior to the bankruptcy filing?

15        A.   Yes.

16        Q.   And on what subjects were they engaged in

17   discussions?

18        A.   Negotiating the terms of our loans.

19        Q.   Were you negotiating terms of DIP

20   financing if the company filed bankruptcy?  Was that

21   a subject that they were discussing with your

22   lender's counsel?

23        A.   What time period?
24        Q.   September 2001.

64

1    A.    I don't recall when those discussions

2    commenced.

3    Q.    But they started at some point in time?

4    A.    They started at some point in time.

5    Q.    Did they start before October 9?

6    A.    Yes.

7    Q.    Do you recall, did they start before

8    October 1st?

9    A.    I don't recall.

10    Q.    The date Polaroid filed bankruptcy, that

11    was October 12, 2001.  Is that right?

12    A.    Yes.

13    Q.    Did it have a stipulated DIP financing

14    budget that it had agreed to with Chase?

15    A.    Yes.

16    Q.    Who was responsible in terms of outside

17    counsel representing Polaroid in connection with

18    negotiating that DIP budget?

19    A.    I was.

20    Q.    I'm sorry?

21    A.    The counsel didn't negotiate the budget.

22    Q.    Who were the parties negotiating the

23    budget?

24    A.    Who were the individuals?

65

1    Q.    Yes.

2    A.    I believe Bill Flaherty and Andra Bolotin,

3  I believe.

4    Q.    And who at Chase did they deal with?

5    A.    I believe they dealt with Kimberly Turner.

6    Q.    What was her position at Chase?

7    A.    I don't know.  Account -- I don't know.

8  And she worked with John McDonough.

9    Q.    What was his position at Chase?

10    A.    I'm not sure.  Managing director,

11  something.  I don't know.

12    Q.    Did you attend any meetings prior to the

13  bankruptcy at which the postpetition financing was

14  discussed?

15          MR. SAUNDERS:  Object to the form of the

16  question.

17    A.    I may have.  I don't recall.  I was not

18  involved in the intensive negotiations.

19    Q.    How do you know there were intensive

20  negotiations?

21    A.    Well, I'm sorry.  I was not involved --

22  I don't know.  I'm sorry.

23    Q.    Did someone report to you, someone at

24  Polaroid, as to the existence of negotiations

66

1    between Polaroid and Chase?

2        A.    Yes.

3        Q.    Who was that?

4        A.    Andra Bolotin, Bill Flaherty.

5        Q.    Over what period of time prior to the

6    bankruptcy did they report to you on that subject?

7        A.    I don't recall specifically.

8        Q.    In the thirty to sixty days before the

9    bankruptcy filing, did they report to you as to the

10   status of their negotiations with Chase?

11               MR. SAUNDERS:  Object to the form of the

12   question.

13       A.    I don't recall the time frame of when the

14   negotiations commenced.

15       Q.    Negotiations concerning the DIP financing?

16       A.    Yes.

17       Q.    What were you told about those

18   negotiations?

19               MR. SAUNDERS:  Mr. Goldman, I instruct you

20   that to the extent people at Polaroid told you

21   things that you understood to be for the purpose of

22   enabling you as general counsel to provide legal

23   advice, to exclude those from your answer.

24               THE WITNESS:  Repeat the question, please.

67

1          (The reporter read the pending question.)

2     A.    Basically I was getting a status report of

3 how they were going.

4     Q.    Over what period of time were you getting

5 this status report?

6     A.    While the negotiations were taking place.

7 During the period of the negotiations.

8     Q.    Do you have a recollection as to whether

9 or not this was more or less than a thirty-day

10 period?

11    A.    No, I don't.

12    Q.    Did anyone indicate to you whether or not

13 the subject of retiree medical costs came up in

14 these negotiations?

15         THE WITNESS:  Can you repeat that, please.

16         (The reporter read the question.)

17    A.    No.

18    Q.    Did anyone indicate to you that the banks,

19 I'm sorry, that Chase had indicated an unhappiness

20 about the expense level at Polaroid?

21    A.    Yes.

22    Q.    And who indicated to you information on

23 that subject?

24    A.    I believe it was Andra Bolotin.

68

1    Q.    What did she say to you on that?

2    A.    I believe she said that the bank thought

3    our expenses going forward -- that our expenses were

4    too high.

5    Q.    Well, this was in the context of a DIP

6    budget.  Isn't that right?

7    A.    Yes.

8    Q.    So her negotiations were with the bank as

9    it related to the bank's willingness or

10   unwillingness to fund Polaroid in a Chapter 11.  Is

11   that right?

12   A.    Yes.

13   Q.    Just so it's clear, Polaroid was

14   negotiating with Chase the terms under which Chase

15   would fund Polaroid in a Chapter 11.  Isn't that

16   right?

17   A.    We were negotiating the terms of the DIP

18   financing arrangement.

19   Q.    And you were told that Chase indicated

20   that the expenses that Polaroid was proposing in its

21   budget were too high.  Isn't that right?

22   A.    Yes.

23   Q.    And those expenses that Polaroid was

24   proposing initially included retiree medical

69

1    expenses.  Isn't that correct?

2        A.    I don't know.

3        Q.    You don't know?

4        A.    I don't know.

5        Q.    Do you have a belief, sir, as to whether

6    or not the initial budgets that Polaroid was

7    providing to Chase in connection with DIP financing,

8    whether or not those budgets included retiree

9    medical expenses?

10       A.    The first budget?

11       Q.    Yes, the initial DIP budgets.

12       A.    I don't know.

13       Q.    Do you have a belief, sir, as to whether

14   or not those initial budgets had a retiree medical

15   expense item?

16       A.    Is a belief different than an assumption?

17       Q.    Do you have an assumption, sir?

18       A.    My assumption is it was included.  I don't

19   know if it was included.

20       Q.    Your assumption is?  I'm sorry.

21       A.    My assumption is retiree medical was

22   included.  I don't know that it was included.

23       Q.    And why do you assume it was included?

24       A.    Because the company was reluctant to

1  terminate those benefits.

2      Q.    And why was the company reluctant to

3  terminate those retiree benefits?

4      A.    Because we wanted to continue benefits to

5  former employees.

6           MR. GREENBERG:  Now, the initial draft DIP

7  budgets that were submitted to Chase Bank, have

8  those been produced?  Do you know?

9           MR. GALARDI:  I don't know.

10          MR. GREENBERG:  Well, obviously we would

11 like them.

12 BY MR. GREENBERG:

13     Q.    Do you have any understanding as to how

14 many different revised DIP budgets were produced by

15 Polaroid?

16     A.    I don't.

17     Q.    Was there an attorney who would have any

18 involvement in the negotiations on the DIP budgets?

19     A.    There was an attorney who was supporting

20 -- I don't know if an attorney was involved in the

21 negotiations of the budget.  I don't think so.

22     Q.    In terms of the medical benefits that

23 retirees were being provided, they paid a percentage

24 of the cost.  Isn't that right?  The retirees did.

73

1    A.    When?

2    Q.    Prior to it being terminated.

3    A.    Yes.

4    Q.    Now, how did Polaroid get that money? How

5    was that payment made? Did retirees pay it directly

6    to the insurance company? Did they pay it to

7    Polaroid? How was it collected from those retirees?

8    A.    I don't know. I don't know how. I

9    believe we paid it directly to the carriers, but I

10   don't know.

11   Q.    Who paid it directly to the carriers?

12   A.    The company.

13   Q.    Paid a hundred percent of it?

14   A.    No, no, paid whatever wasn't subsidized.

15   The retiree paid a portion and the company paid a

16   portion.

17   Q.    So the retiree would pay it directly to

18   the insurance company. Is that right?

19   A.    That's my belief, yes.

20   Q.    When would Polaroid make its payment? In

21   other words, would it make it monthly in advance?

22   Would it make it monthly in arrears? When would it

23   make its payment?

24   A.    I believe it was in advance. I don't know

1    whether it was monthly or quarterly.

2        Q.    But Polaroid would pay at the beginning of

3    the month for the end of the month?  I'm sorry.  To

4    cover that month.  Is that right?

5        A.    The period.  I don't know whether it was a

6    monthly payment or quarterly payment, but I believe

7    it was paid in advance.

8        Q.    And did Polaroid make the medical

9    insurance payment for retirees at the beginning of

10    October 2001 to cover the month of October?

11        A.    I don't know.

12        Q.    Well, who would know?

13        A.    Mary Kelly would know.

14        Q.    Let me just ask you something:  Was one of

15    the providers Harvard Pilgrim for retirees?

16        A.    I believe so.

17        Q.    I was looking at your payment to creditors

18    schedule and it showed a payment to Harvard Pilgrim

19    dated October 1, 2001, of $543,295.18, and I'll just

20    show you that.  Was any portion of that payment to

21    cover retiree medical benefits for the month of

22    October?

23        A.    I don't know.
24        Q.    Well, you do know that you told all

73

1    retirees sometime in October that their medical

2    benefits had been terminated retroactively to

3    October 1. Isn't that correct?

4        A.    No, I don't know that.

5        Q.    Did you at any point in time inform

6    retirees that their medical benefits were being

7    terminated?

8        A.    Yes.

9        Q.    How did you do that?

10       A.    There was a mailing to retirees.

11       Q.    And when was the effective date of that

12   termination?

13       A.    I don't recall.

14       Q.    So sitting here today you don't know

15   whether or not in fact Polaroid paid for insurance

16   benefits for retirees for the month of October 2001?

17       A.    That's correct.

18       Q.    At any point in time after the bankruptcy

19   was filed, did you ever investigate whether or not

20   payment had been made?

21       A.    No.

22       Q.    Did anyone at Polaroid ever try to get a

23   refund from any of the insurance companies with

24   respect to any payments that had been made?

74

1      A.    I believe so, but I'm not sure.

2      Q.    I'm sorry?

3      A.    I believe so, but I'm not sure.

4      Q.    What do you believe happened?

5      A.    I believe there was -- I recall a

6  discussion about a prepayment of benefits and some

7  adjustment, but I don't recall the specifics.

8      Q.    Who do you recall that discussion

9  involving?

10     A.    Mary Kelly and Louise Cavanaugh.

11     Q.    When did that discussion take place?

12     A.    I'm not sure.  October, November,

13  December.  I don't know.

14     Q.    Who raised that subject with you?

15     A.    Either Louise Cavanaugh or Mary Kelly.  I

16  don't remember.

17     Q.    Did Polaroid ever get a refund?

18     A.    I don't know.

19     Q.    Did anyone from Polaroid ever tell the

20  retirees that the payment for the month of October

21  2001 had been made by Polaroid?

22     A.    I don't know.

23     Q.    Besides Harvard Pilgrim or Harvard

24  Community Health, was there any other insurance

75

1    company, insurance provider that Polaroid subsidized

2    for retirees prior to the bankruptcy filing?

3         MR. SAUNDERS:  Object to the form of the

4    question.

5         A.   I believe we subsidized whatever carriers,

6    whatever choices retirees had.

7         Q.   But, if I understand your testimony, you

8    believe that Polaroid paid its portion of the

9    October 2001 premium payment for the various

10   insurance providers for retirees?

11        MR. SAUNDERS:  Objection to the form of

12   the question.

13        A.   I don't think that's what I said.  What I

14   said was I believe that payments were made in

15   advance, not in arrears.  I don't have specific

16   knowledge of October 2001.

17        Q.   But you do recall discussing the

18   possibility of trying to get a refund?

19        A.   I have a recollection of a conversation.

20   I don't recall the details.

21        MR. GREENBERG:  Can I mark as the next

22   exhibit a letter dated October 9, 2001.

23        (Goldman Deposition Exhibit 3 marked for

24   identification.)

1    BY MR. GREENBERG:

2        Q.    Mr. Goldman, do you recognize this

3    document?

4        A.    Yes.

5        Q.    Excluding the handwriting, is this the

6    letter you sent notifying retirees that their

7    benefits had been terminated?

8        A.    Yes.

9        Q.    When did you sign this letter, if you did?

10       A.    Well, it's an electronic signature.

11       Q.    When was the first time you saw this

12   letter?

13       A.    I don't recall.

14       Q.    Did you see it before October 9?

15       A.    Yes.

16       Q.    You saw it prior to October 9?

17       A.    Yes.

18       Q.    Did you see it prior to October 8?

19       A.    I don't recall.

20       Q.    Now, this says "Regrettably, we must

21   terminate the plans immediately."  Do you see that?

22       A.    Yes.

23       Q.    If I understand your testimony, previously

24   when Polaroid made any changes in retiree benefits,

77

1    it would give retirees some advance notice.    That's

2    your recollection.    Is that correct?

3        A.    No.

4        Q.    That's not your recollection?

5        A.    No.

6        Q.    Had Polaroid implemented changes in

7    retiree benefits without giving advance notice in

8    the past?

9        A.    I don't know.

10        Q.    Now, on October 9 you were aware that

11    Polaroid had already paid for -- Strike that.    On

12    October 9 Polaroid was aware it had already paid for

13    retiree medical benefits for the month of October?

14            MR. SAUNDERS:    Object to the form of the

15    question.

16        A.    Is that a question?

17        Q.    Isn't that a correct statement?

18        A.    Can you repeat it?

19        Q.    I'll rephrase the question.

20            Why didn't you just tell retirees that

21    we're going to terminate effective November 1 or

22    October 31 since Polaroid had already paid the

23    premiums?

24            MR. SAUNDERS:    Object to the form of the

1   question.

2       A.    We didn't have money in the budget going

3   forward to pay for these benefits.

4       Q.    Which budget?

5       A.    The DIP budget.

6       Q.    The final one that the bank had agreed to

7   fund.  Is that right?

8       A.    Yes.

9       Q.    The earlier one, the initial one, did have

10  money but the final one that the bank agreed to fund

11  didn't have it.  Is that right?

12      A.    I didn't say that.  You asked me what I

13  assumed was in the initial DIP budget and I told

14  you.  I didn't see the initial DIP budget.

15      Q.    But why didn't you simply tell retirees

16  that we're going to terminate these plans effective

17  October 31 since you'd already paid October?

18          MR. SAUNDERS:  Object to the form of the

19  question.

20      A.    We made a decision that it was in the best

21  interests of the company to terminate the plan

22  effective immediately.

23      Q.    Well, what about your responsibilities as

24  a fiduciary to the retirees?  Did you consider that

1    at all in your decision?

2            MR. SAUNDERS:  Object to the form of the

3    question.

4        A.    I was not acting as a fiduciary or the

5    plan administrator in terminating this plan.

6        Q.    And when you say you viewed it was in the

7    best interests of the company to do a termination

8    effective immediately as opposed to at the end of

9    October, why did you believe an immediate

10   termination was better than a termination the end of

11   October?

12       A.    We believed that the company going forward

13   as a Chapter 11 entity had to dramatically reduce

14   its costs immediately, and this was one decision

15   that we took immediately.

16       Q.    Were you concerned that if the termination

17   took place after the Chapter 11 was filed, that

18   retirees might have greater rights?

19           MR. SAUNDERS:  Hold on just a minute.

20   (Pause)  Read the question back.

21           (The reporter read the question.)

22           THE WITNESS:  Can I confer with counsel on

23   privilege?
24           MR. GREENBERG:  Sure.

80

1          (Mr. Saunders, Mr. Gallagher, Mr. Galardi

2     and the deponent left the room and returned

3     shortly.)

4          THE WITNESS:  Can you repeat the question,

5     please?

6          MR. GREENBERG:  Sure.  Would you read it

7     back.

8          (The reporter read back as follows:

9          "Question:  Were you concerned that if the

10         termination took place after the Chapter 11 was

11         filed, that retirees might have greater

12         rights?")

13         MR. SAUNDERS:  Mr. Goldman, I'm going to

14    instruct you that you can testify about whether or

15    not there were legal considerations that were a

16    factor in any decision you were a part of making,

17    but I will instruct you not to disclose what the

18    legal considerations were or what kinds of questions

19    you asked to counsel and what responses you got from

20    counsel on the basis of attorney-client privilege.

21         So I think that with respect to that

22    question as it has been asked, I would instruct you

23    not to answer.

24    BY MR. GREENBERG:

1       Q.    Were there legal considerations for making

2    the termination of retiree benefits effective

3    immediately as opposed to making them effective as

4    of the end of October?

5       A.    Yes.

6       Q.    And were those legal considerations

7    matters that you received advice on from outside

8    counsel?

9             MR. SAUNDERS:  You can answer that yes,

10   no, "I don't know," "I don't recall."

11      A.    Yes.

12      Q.    And from whom did you receive advice on

13   that subject?

14      A.    Gary Ford, David Kurtz and Gregg Galardi.

15      Q.    Now, when did you first learn that a

16   decision had been made at Polaroid to terminate

17   retiree medical benefits?

18            MR. SAUNDERS:  Object to the form of the

19   question.

20            MR. GREENBERG:  I'll rephrase it.  Good

21   objection.

22   BY MR. GREENBERG:

23      Q.    At some point in time did you learn that a
24   decision had been made at Polaroid to eliminate

82

1    retiree medical benefits?

2        A.    Yes.

3        Q.    When?

4        A.    At the board meeting of October 9, 2001.

5        Q.    And when did that take place?  What time

6    of day did that board meeting take place?

7        A.    I don't recall.

8        Q.    Was it morning, afternoon, evening?

9        A.    It should be reflected in the minutes.

10   I don't recall.

11           MR. GREENBERG:  Well, let me show you a

12   document that is identified as minutes of board of

13   directors, Polaroid Corporation, October 9, 2001.

14   Actually, we can mark that as Exhibit 4.

15           (Goldman Deposition Exhibit 4 marked for

16   identification.)

17   BY MR. GREENBERG:

18       Q.    It says a telephonic meeting of the board

19   of directors of Polaroid Corporation was held on

20   October 9, 2001.  The meeting was called to order at

21   5:00 o'clock p.m.  You drafted these minutes?

22       A.    Yes.

23       Q.    Let me just go back to one thing I'm

24   curious about.  Exhibit 3, which is your letter to

83

1    retirees, is dated October 9, 2001.  Was this letter

2    done before the board actually had its telephonic

3    meeting?

4              MR. SAUNDERS:  Object to the form of the

5    question.

6         A.    The drafting of the letter was probably

7    started prior to October 9, 2001.

8         Q.    When was it started?

9         A.    I don't recall.

10        Q.    Who drafted it?

11        A.    I don't know specifically who drafted it.

12        Q.    Did you participate in the drafting of it?

13        A.    No.  I saw a draft.

14        Q.    Did you comment on the draft?

15        A.    Yes.

16        Q.    What were your comments?

17        A.    I don't recall.  I marked it up.

18        Q.    The draft you saw, did it make the

19    termination of benefits effective immediately?

20        A.    I don't recall.

21        Q.    Did you see a draft prior to October 9?

22        A.    I believe so.

23        Q.    How many days prior to October 9 did you

24    see a draft?

84

1    A.    I don't recall.

2    Q.    Was it more than one day before?

3    A.    Probably.

4    Q.    Was it more than two days before?

5    A.    Maybe.

6    Q.    Was it more than a week before?

7    A.    I don't think so.

8    Q.    Did you see more than one draft?

9    A.    I don't recall.

10   Q.    Who presented you with a draft?

11   A.    Either Mary Kelly or Louise Cavanaugh.

12   Q.    Now, what happened on October 9 at this

13   board meeting on the subject of retiree benefits?

14   Was anything discussed on that subject?

15   A.    Yes.

16   Q.    How long did that telephonic meeting last?

17   A.    An hour and ten minutes.

18   Q.    And was the subject of a Chapter 11 filing

19   discussed also?

20   A.    I believe it was.

21   Q.    Was the filing authorized at that meeting?

22   A.    I believe it was.

23   Q.    It says on Exhibit 4, the second page,
24   Retiree Medical and Life Insurance.  It says that

1    "Mr. Flaherty led a discussion regarding the

2    company's financial commitments under the retiree

3    medical plan and retiree life insurance plan."  Do

4    you see that?

5        A.    Yes.

6        Q.    And then it says "After a full and

7    complete discussion of these plans."  Who spoke on

8    that subject besides Mr. Flaherty?

9        A.    I don't recall specifically.  Some of the

10   directors.  There was an exchange with some of the

11   directors.

12       Q.    Which directors spoke?

13       A.    I don't recall.

14       Q.    Was there any explanation as to the

15   implications of terminating these plans before a

16   bankruptcy was filed?

17       A.    I don't recall.

18       Q.    Was the DIP budget discussed at that

19   meeting, this telephonic meeting?

20       A.    I don't recall.

21       Q.    Had the DIP budget been finalized as of

22   this telephonic meeting?

23       A.    I don't know.
24       Q.    What was said on the subject of whether or

1   not to terminate the retiree medical plan and

2   retiree life insurance plan?

3        A.    There was a discussion of the --

4              MR. SAUNDERS:  Hold on a second.

5   Mr. Goldman, let me instruct you to exclude from

6   your answer any discussion of legal advice.

7        A.    There was a discussion of the cost of the

8   program, of the need for an operating budget, the

9   need to cut expenses.  Mr. Flaherty presented the

10  costs, and I believe there may have been advice

11  given by David Kurtz as well.

12       Q.    On what subject?

13       A.    On the termination of retiree medical

14  benefits and life insurance.

15       Q.    Was that advice also in the context of a

16  Chapter 11 filing?

17             MR. SAUNDERS:  Object to the form of the

18  question.

19             THE WITNESS:  Can you repeat the question,

20  please?

21             (The reporter read the pending question.)

22       A.    No.  The advice to the directors was with

23  respect to the termination under the plan.

24       Q.    Did anyone advise Polaroid that it had a

1    right to terminate effective immediately on October

2    9, 2001, the retiree health plan and life insurance

3    plan?

4           MR. SAUNDERS:   Instruction not to answer.

5    BY MR. GREENBERG:

6       Q.    Did anyone at Polaroid or on behalf of

7    Polaroid investigate prior to October 9, 2001,

8    whether or not Polaroid had a right to terminate

9    effective immediately the retiree health plan and

10   retiree life insurance plan?

11          MR. SAUNDERS:   Object to the form of the

12   question.  You can answer it yes, no, "I don't

13   know," "I don't recall," Mr. Goldman.

14      A.    I don't understand.  Did they investigate?

15      Q.    Yes.

16      A.    Repeat the question.

17          (The reporter read back as follows:

18          "Question:  Did anyone advise Polaroid

19      that it had a right to terminate effective

20      immediately on October 9, 2001, the retiree

21      health plan and life insurance plan?")

22          MR. SAUNDERS:   Same objection and

23   instruction.

24      A.    Yes.

88

1     Q.     Who?

2     A.     Louise Cavanaugh.

3     Q.     When did she undertake that investigation?

4     A.     I don't know.

5     Q.     Did she ever report to you on the results

6     of that?

7            MR. SAUNDERS:  Answer that yes, no, "I

8     don't know," "I don't recall."

9     A.     I wouldn't characterize it as an

10    investigation.  She provided advice on the plan.

11    Q.     What was her advice?

12           MR. SAUNDERS:  Instruction not to answer.

13    BY MR. GREENBERG:

14    Q.     Was her advice in writing?

15    A.     No.

16    Q.     Now, did Polaroid ever advise the service

17    providers that the plan was being terminated?

18    A.     Yes.

19    Q.     When was that notice given?

20    A.     I don't know.

21    Q.     Was it before or after after October 9?

22    A.     I don't know.

23    Q.     Who was responsible for providing that
24    notice?

89

1      A.     I think Mary Kelly.

2      Q.     Did the service provider contracts require

3      a specified advance notice to be given?

4      A.     I don't know.

5             MR. GREENBERG:  Let me just show you a

6      document which is entitled Account Agreement Entered

7      Into with Blue Cross and Blue Shield of

8      Massachusetts, and let's mark that as Exhibit 5.

9             (Goldman Deposition Exhibit 5 marked for

10     identification.)

11            MR. TORMEY:  What document is this?

12            MR. GREENBERG:  It's an account agreement

13     between Blue Cross/Blue Shield --

14            MR. TORMEY:  Account agreement?

15            MR. GREENBERG:  Account agreement.  -- and

16     Polaroid.

17     BY MR. GREENBERG:

18     Q.     This is a document that Polaroid's counsel

19     I believe produced in connection with this matter,

20     sir.  There is a reference on page 4 dealing with

21     termination of the agreement and it says that this

22     agreement may also be terminated for any reason by

23     either party on any date upon thirty days' prior
24     written notice to the other.  Do you see that?

90

```
 1      A.   Yes.

 2      Q.   Was any such notice given by Polaroid to

 3   Blue Cross?

 4      A.   I don't know.

 5      Q.   Was notice given prior to October 9?

 6      A.   I don't know.

 7      Q.   So you don't know whether or not Polaroid

 8   has ever in fact complied with this notice

 9   provision?

10      A.   Correct.

11           MR. SAUNDERS:  Object to the form of the

12   question.

13   BY MR. GREENBERG:

14      Q.   Other than yourself, who would know?

15      A.   Mary Kelly I believe would know.

16      Q.   After the meeting on October 9, 2001,

17   after the board meeting, did you give instructions

18   to anyone with respect to effectuating this

19   termination?

20      A.   Yes.

21      Q.   Who did you give instructions to?

22      A.   Louise Cavanaugh.

23      Q.   What did you tell her?
24           MR. SAUNDERS:  Let me instruct you to
```

1      exclude from your answer any discussion of legal

2      advice.   To the extent that you gave other

3      instruction to Ms. Cavanaugh, you can testify about

4      that.   But to the extent it was a discussion of

5      legal issues, you should avoid that.

6           A.     I asked her to work with the benefits

7      department to carry out the intent and purposes of

8      the --

9           Q.     And what did she do if anything?

10          A.     I don't know.

11          Q.     Did she ever report to you on whether or

12     not she effectuated the termination?

13          A.     No.

14          Q.     So sitting here today you don't know

15     whether or not she did?

16          A.     No.

17                 MR. GREENBERG:   Let me just show you a

18     document entitled The Polaroid Retiree Medical Plan

19     Effective October 9, 2001.   Will you mark that as

20     Exhibit 6.

21                 (Goldman Deposition Exhibit 6 marked for

22     identification.)

23     BY MR. GREENBERG:
24          Q.     Exhibit 6, look at the last page, I ask

92

1    you if you recognize that signature.

2        A.    Yes.

3        Q.    Whose is it?

4        A.    It's my signature.

5        Q.    When did you sign this document?

6        A.    I don't recall when I signed this

7    document.

8        Q.    Is it your practice not to date documents

9    that you sign?

10       A.    No.

11       Q.    Your practice is to date documents, isn't

12   it?

13       A.    No.

14       Q.    You don't know when you signed this.

15   Where were you when you signed the document?

16       A.    I don't know.  Probably in my office.

17       Q.    Who prepared this document?

18       A.    Louise Cavanaugh.

19       Q.    Did she give it to you to sign?

20       A.    I don't recall her giving it to me to

21   sign.  Somebody gave it to me to sign.

22       Q.    Well, how do you know she prepared it?

23       A.    Because she's responsible for reviewing
24   and preparing these kinds of documents.

1          Q.     What was this document intended to

2     accomplish, if you know?

3                 MR. SAUNDERS:  Object to the form of the

4     question.

5          A.     (Pause)   The purpose of the document is to

6     set out the terms of the retiree medical plan

7     effective October 9, 2001.

8          Q.     The purpose was to terminate the plan.

9     Isn't that right?

10         A.     The plan was terminated upon the board's

11    action.

12         Q.     When did you sign this document?  Did you

13    sign this document before or after the board meeting

14    on October 9?

15         A.     I don't recall when I signed this

16    document.

17         Q.     Did you sign it after the Chapter 11 was

18    filed?

19         A.     I don't recall when I signed this

20    document.

21         Q.     So you may have signed it after the

22    Chapter 11 was filed, you just don't know?

23         A.     I don't recall when I signed this
24    document.

1       Q.      The board minutes also refer to

2    terminating a retiree life insurance plan.

3       A.      Correct.

4       Q.      Did you sign any document reflecting that

5    the retirees' life insurance plan was terminated?

6       A.      I don't recall.

7       Q.      You don't recall ever signing such a

8    document?

9       A.      I don't recall.

10      Q.      Well, I mean, we haven't seen such a

11   document and if one existed, you certainly would

12   have provided it to us.  Right?

13      A.      Yes.

14      Q.      So sitting here today you have no

15   knowledge of ever having signed a restated retiree

16   life insurance plan terminating the life insurance

17   plan?

18              MR. SAUNDERS:  Would you read that back,

19   please.

20              (The reporter read the question.)

21      A.      I have no recollection of signing a

22   document regarding changes to the medical plan

23   effective October 9, 2001.
24      Q.      I'm asking about the life insurance plan.

1        A.    I'm sorry.  The life insurance plan.

2             MR. GREENBERG:   Let me mark, if I can,

3    what we understand to be the last Polaroid retiree

4    group life insurance plan amended effective January

5    1, 1990.  Can we mark that as the next exhibit.

6             (Goldman Deposition Exhibit 7 marked for

7    identification.)

8    BY MR. GREENBERG:

9        Q.    Mr. Goldman, let me show you what has been

10   marked as Exhibit 7 and ask you:  Did you ever sign

11   a Polaroid retiree group life insurance plan

12   effective October 9, 2001?

13       A.    I don't recall signing one.

14       Q.    Did the fact that you didn't sign one come

15   to your attention at any point before today?

16       A.    No.

17            MR. SAUNDERS:   Object to the form of the

18   question.

19   BY MR. GREENBERG:

20       Q.    Now, the life insurance plan, the provider

21   for the life insurance was what company?

22       A.    I don't recall.

23       Q.    Was it John Hancock?
24       A.    I don't recall.

96

1      Q.    Did Polaroid ever notify the life

2  insurance provider for retiree life insurance that

3  the plan had been terminated?

4      A.    I don't know.

5      Q.    Did you instruct someone to take action on

6  that subject?

7      A.    No.

8      Q.    So, if I understand, you are not aware of

9  whether or not any notice was ever sent to John

10  Hancock concerning the termination of the life

11  insurance?

12      A.    Correct.

13      Q.    Who would know whether or not that notice

14  was sent?

15      A.    I believe Mary Kelly would know.

16      Q.    And if she had sent such a notice, you

17  would expect it would have been in writing.  Right?

18      A.    Yes.

19      Q.    Prior to October 9, were you aware that

20  the termination of retiree benefits was going to be

21  the subject of the board meeting?

22          MR. SAUNDERS:  Object to the form of the

23  question.

24      A.    Yes.

1    Q.   Was there an agenda prepared in connection

2  with that meeting?

3    A.   I don't think so, no.

4    Q.   When did you become aware that the October

5  9 meeting, one of the subjects was the termination

6  of the retiree benefits?

7    A.   I don't recall specifically.

8    Q.   Was it a few days before or longer?

9    A.   It wasn't longer.  It was at most a few

10  days.

11    Q.   And how did you learn that?

12    A.   How did I learn?  We were requesting board

13  action.  One of the items that we were requesting

14  action on was the retiree plan.  A couple of days

15  before or a day before -- I don't know specifically

16  when -- we finalized the agenda; that's when we

17  decided we would take it to the board.

18    Q.   The we is whom?

19    A.   I'm sorry.  Gary DiCamillo and me.

20    Q.   The two of you made the decision to make

21  this recommendation to the board of directors.  Is

22  that right?

23    A.   Yes.  Bill Flaherty may have been
24  involved.  I don't recall.  I think he was,

98

1    actually.

2        Q.    Just so I'm clear, it was Mr. Flaherty,

3    Mr. DiCamillo and yourself who made the decision

4    that you were going to recommend to the board the

5    elimination of retiree benefits.  Is that right?

6        A.    Yes.

7        Q.    And when was that decision made that you

8    were going to make that recommendation?

9        A.    I don't recall specifically.  It was very

10   close to the time of the meeting.

11       Q.    Was the October 9 meeting a regularly

12   scheduled board meeting?

13       A.    No.

14       Q.    Did you, Mr. DiCamillo and Mr. Flaherty

15   have some meeting in early October in which you

16   agreed on this recommendation?

17       A.    I believe we did.  I don't -- I can't

18   exactly place the meeting, but we had a discussion

19   about the subject.

20       Q.    When?

21       A.    Prior to the board meeting.

22       Q.    How much prior to the board meeting?

23       A.    I don't recall specifically.
24       Q.    Was it a matter of days?

1    A.    I don't know.

2         MR. SAUNDERS:  If you're moving into a new

3    area, can we take a break?

4         MR. GREENBERG:  Sure.

5         (Discussion off the record.)

6         (In recess 12:18 p.m. to 12:27 p.m.)

7    BY MR. GREENBERG:

8    Q.    Was there a practice over the years at

9    Polaroid that allowed employees who were being

10   notified that their position was going to be

11   eliminated to try to find another position within

12   Polaroid?

13   A.    I believe there was.

14   Q.    And what was that practice?

15   A.    Well, I don't know specifically.  I

16   believe that employees were encouraged to look at

17   the job postings that were available within the

18   company and if they were interested in applying for

19   them, they should do that.  My understanding is the

20   company posts job openings.

21   Q.    And for how long had the practice of

22   allowing employees that had been notified their

23   position was going to be eliminated to try to find

24   other positions within the company, how long was

102

1    that policy or practice, rather, in place at

2    Polaroid?

3        A.    I don't know.

4        Q.    Was it in place during the years that you

5    worked there?

6        A.    Yes.

7        Q.    At any point in time prior to October 12,

8    did you advise employees at Polaroid that the

9    company was going to be filing a Chapter 11

10   proceeding?

11       A.    No.

12       Q.    At any point prior to October 9, 2001, did

13   you advise retirees that their benefits were going

14   to be terminated?

15       A.    No.

16       Q.    At any point in calendar 2001 prior to

17   October 9, did you ever advise retirees that their

18   benefits might be terminated?

19            MR. SAUNDERS:   Objection to the form of

20   the question.

21   BY MR. GREENBERG:

22       Q.    And I'm asking you, Neal Goldman, in your

23   capacity as an employee of Polaroid or in your
24   capacity as a plan fiduciary.

1          MR. GALARDI:  Excuse me.  Could you read
2     the question back?  I couldn't hear it.
3          MR. GREENBERG:  Let me rephrase it.
4     BY MR. GREENBERG:
5          Q.    In your capacity as a plan fiduciary and
6     also in your capacity as an employee of Polaroid --
7          A.    Can you ask me two separate questions?
8          Q.    Sure.  In your capacity as a plan
9     fiduciary, did you between January 1, 2001, and
10    October 9, 2001, ever advise Polaroid retirees that
11    their benefits might be terminated?
12         A.    No.
13         Q.    In your capacity as an employee of
14    Polaroid between January 1, 2001, and October 9,
15    2001, did you ever advise retirees in writing that
16    their benefits might be terminated?
17         A.    No.
18         Q.    Did you ever advise retirees verbally that
19    their benefits might be terminated?
20         A.    Not to my recollection, no.
21         Q.    Did you oppose the decision to terminate
22    retiree benefits?
23         MR. SAUNDERS:  Object to the form of the
24    question.

104

1       Q.    The board of directors' decision.  Did you

2   speak against it?

3       A.    No.

4       Q.    When you said you spoke with --

5       A.    I'm sorry.  You're talking at the board

6   meeting?

7       Q.    I'll break it down.  First of all, on

8   October 9 at the board meeting did you speak against

9   eliminating the retiree benefits?

10      A.    No.

11      Q.    Now, you said before that you had a

12  meeting with Mr. Flaherty and Mr. DiCamillo at which

13  the decision was made prior to October 9 to present

14  to the board a recommendation to eliminate retiree

15  benefits.  Isn't that right?

16      A.    Yes.

17      Q.    Was that recommendation unanimous?  You,

18  Mr. DiCamillo and Mr. Flaherty all agreed that you

19  were going to make that recommendation?

20      A.    Yes.

21      Q.    During your discussion with Mr. Flaherty

22  and Mr. DiCamillo in which you agreed to make that

23  recommendation, did you speak against eliminating
24  retiree benefits?

105

1     A.    I'm having trouble with the form of the

2    question.  There was a discussion about the

3    implications of doing it, what it would mean, and

4    there was a general discussion.  I don't know that I

5    can say anybody spoke against it.  People expressed

6    concern about the impact on retirees but we felt

7    that because of the financial constraints the

8    company had, this was something that had to be done.

9    Q.    And this is the meeting between you,

10   Mr. DiCamillo and Mr. Flaherty?

11   A.    Yes.

12   Q.    What was discussed on the implications?

13   A.    Well, we were clearly concerned with the

14   financial impact it would have on retirees.

15   Q.    That was discussed?

16   A.    Yes, and everybody -- I think all three of

17   us felt badly about that.

18   Q.    What about the fact that some retirees

19   might actually be in the hospital or might have made

20   plans to undergo surgery in reliance upon these

21   benefits?  Was that discussed?

22   A.    No.

23   Q.    Was there any concern discussed about
24   giving retirees advance notice?

106

1    A.    Yes.

2    Q.    What was said on that subject?

3    MR. SAUNDERS:  I am going to instruct you

4    to exclude from your answer discussion of legal

5    considerations or legal advice, if any.

6    A.    The question that was discussed was the

7    financial impact of continuing benefits.  We knew it

8    was over a million dollars a month and we thought

9    under the circumstances that immediate action needed

10   to be taken.

11   Q.    When you say immediate action, you decided

12   that you couldn't give these retirees even thirty

13   days' notice that their benefits were going to be

14   eliminated.  That's what the decision was?

15   MR. SAUNDERS:  Object to the form of the

16   question.

17   A.    No, I don't think we made the decision on

18   that basis.

19   Q.    Well, you said it was a financial

20   consideration.  Is that right?

21   A.    That's right.

22   Q.    At the time Polaroid had already paid the

23   benefits through October.  Isn't that right?

24   MR. SAUNDERS:  Object to form.

1      A.    I don't know.

2      Q.    Isn't it true that the only reason the

3  benefits were terminated immediately was because of

4  legal considerations?

5           MR. SAUNDERS:  Instruction not to answer.

6  BY MR. GREENBERG:

7      Q.    Isn't it correct that the reason no

8  advance notice was given retirees was because of the

9  concerns Polaroid had that if those benefits existed

10 post-Chapter 11 filing?

11          MR. SAUNDERS:  Are you finished?

12          MR. GREENBERG:  Yes.

13          MR. SAUNDERS:  Instruction not to answer.

14 BY MR. GREENBERG:

15     Q.    Was there any attempt to persuade Chase to

16 fund an amount of money in the DIP to cover retiree

17 benefits for a period of time?

18          MR. SAUNDERS:  Object to the form of the

19 question.

20     A.    I don't know.

21     Q.    Was that something you inquired into?

22     A.    No.

23     Q.    In your capacity as a trustee and a

24 fiduciary for the retirees, what did you do in

108

1    September or October to try to protect the retirees?

2            MR. SAUNDERS:   Object to the form of the

3    question.

4        A.    The responsibility of the plan

5    administrator is to administer a plan.  The plan

6    administrator administered the plan that was in

7    effect at the time.

8        Q.    But you knew you were a fiduciary to the

9    retirees under the plan documents.  Right?

10       A.    Right.

11       Q.    And you knew you had a duty to look out

12   for the interests of retirees as it related to their

13   rights under the plan.  Correct?

14           MR. SAUNDERS:   Object to the form of the

15   question.

16       A.    No.

17       Q.    Does the plan have insurance, liability

18   insurance to cover the fiduciaries?

19       A.    I believe it does.  I'm not sure.

20       Q.    Is that policy paid for by Polaroid?

21       A.    Yes.

22       Q.    And that policy still is in effect?

23       A.    I believe it is.
24       Q.    Has any notice been given to the insurance

109

1    company as to potential liability that the plan

2    fiduciaries may have to retirees?

3           MR. SAUNDERS:  Object to the form of the

4    question.

5       A.   I'm not aware of a notice having been

6    given.

7       Q.   Can you just tell me if you did anything

8    in September, October, August, July of 2001 to try

9    to protect the interest of the retirees?

10          MR. SAUNDERS:  Object to the form of the

11   question.

12      A.   I don't recall specific actions taken by

13   the plan administrator in that time frame.

14      Q.   Well, the plan administrator was you.

15      A.   No, it was a committee.  I was the

16   chairman of the plan administrator.

17      Q.   You were the chairman of --

18      A.   Met by committee.

19      Q.   Every member of the committee was a

20   fiduciary.  Right?

21      A.   Yes.

22      Q.   Did the committee, for example, say to

23   Mr. DiCamillo or Mr. Flaherty "We can't do this, we

24   can't eliminate these plans immediately without

110

1    giving these retirees notice"?

2        A.    I am not aware that they knew this

3    discussion was taking place.

4        Q.    Well, did you tell the committee members

5    in October that this discussion was taking place?

6        A.    No.

7        Q.    When did you tell the committee members

8    that a decision had been made to terminate the plan?

9        A.    They received notice on -- This was public

10   knowledge within the company on October 9.

11       Q.    So prior to sending out the letter on

12   October 9 -- Strike that.  What was public knowledge

13   on October 9?

14       A.    I believe that we did -- I shouldn't say

15   public knowledge.  I believe that when we did this

16   notice to retirees, I believe we published something

17   internally in the company.  That's my recollection.

18       Q.    What did you publish internally?

19       A.    I don't remember.

20       Q.    What was the date of it?

21       A.    I don't remember.

22       Q.    As chairman of the committee, did you make

23   any effort to convince Mr. Flaherty or Mr. DiCamillo

24   or the board that they should not terminate retiree

111

1    benefits?

2              MR. SAUNDERS:  Object to the form of the

3    question.

4         A.    Not in that capacity, no.

5         Q.    I'm sorry?

6         A.    Not in that capacity, no.

7         Q.    In any capacity, did you make any attempt

8    to get them to maintain retiree benefits?

9         A.    We presented to the board our financial

10   situation and the options available.  The board made

11   the decision to terminate.

12        Q.    Was one of the options available to

13   continue the retirement benefits for retirees?

14        A.    I suppose the board could have continued

15   the benefits to retirees.

16        Q.    Sir, on October 9 you made a presentation

17   to the board of directors.

18        A.    Correct.

19        Q.    You said you gave the board options.  Is

20   that right?

21             MR. SAUNDERS:  Object to the form of the

22   question.

23        A.    No.  I believe what I said earlier was

24   that there was a recommendation to terminate retiree

1    medical benefits.

2        Q.    Did you provide the board with an option

3    to maintain those benefits?

4        A.    At that meeting?  No.

5        Q.    In September did you provide that option?

6        A.    No.

7        Q.    What steps, if any, did you take in any

8    capacity to provide retirees with advance notice

9    that their benefits would be terminated?

10        A.    I am not aware of any steps we took to do

11    that.

12        Q.    Why not?

13        A.    Because we didn't make the decision until

14    October 9.  At the same time we were negotiating a

15    budget with the banks and trying to make decisions

16    about what money we had available.

17        Q.    Well, when you say what money you had

18    available, let me just mark, if I can, because I was

19    actually curious, this document entitled -- Let me

20    just back up.  If I understand, it was Polaroid's

21    position and your position that you couldn't afford

22    the $15 million a year or so it would cost to

23    maintain retiree benefits.  Is that right?

24        A.    Correct.

1      Q.    And it was in that context that Polaroid

2    claims it decided it was going to eliminate those

3    benefits.  Is that right?

4        A.    Correct.

5            MR. GREENBERG:  Let's mark, if we can, as

6    the next exhibit a Statement of Financial Affairs of

7    Polaroid Corporation.

8            (Goldman Deposition Exhibit 8 marked for

9    identification.)

10   BY MR. GREENBERG:

11       Q.    Were you involved in the preparation of

12   Polaroid's schedule filed in the bankruptcy?

13       A.    No, I reviewed some of it.  I did not

14   prepare it.

15       Q.    Did I just misread this or did your salary

16   actually get increased in calendar 2001?

17            MR. SAUNDERS:  Object to the form of the

18   question.

19            MR. GREENBERG:  I'll rephrase it.

20   BY MR. GREENBERG:

21       Q.    Mr. Goldman, did you actually receive an

22   increase in your salary in 2001 or not?

23       A.    I can't recall my last pay increase.
24            (Mr. Gray entered the room.)

1      Q.    Well, I mean, I looked at the payments to

2   insiders and I saw here wages/earnings, it's

3   Schedule 3B, page 17 of 55.  And if you look at 17

4   and 18, it looked to me as though your salary went

5   up, biweekly salary, from $12,116 to $13,461

6   sometime in July.  Is that right?

7      A.    I think that is right.

8      Q.    So whatever the financial condition of

9   Polaroid -- Strike that.

10          Now, on the schedule it indicates on

11   payments to creditors Goodwin Procter & Hoar.  What

12   was their involvement with Polaroid?

13      A.    They're outside counsel to us.  They

14   represented the company on various matters.

15      Q.    Were they involved at all on restructuring

16   advice?

17      A.    I think they were involved in securing

18   certain collateral.

19      Q.    What do you mean by that, securing

20   collateral?

21      A.    We had had negotiations with the banks and

22   we had agreed to give certain collateral, secured

23   interests in real estate, to lenders and I believe

24   they supported us in that effort, did title searches

115

1    and various things.

2        Q.    And that was in connection with

3    restructuring?

4        A.    It was in connection with -- In a broad

5    sense, yes.

6        Q.    I saw on the payments to creditors also

7    Jones Day, a payment on October 4, just a few days

8    before the bankruptcy.  Was Jones Day involved in

9    providing legal services to Polaroid?

10       A.    Jones Day was providing legal services to

11   the CEO, being paid for by the company.

12       Q.    As it related to what?

13       A.    Related to his personal situation, his

14   contract.

15       Q.    Why was Polaroid paying for

16   Mr. DiCamillo's personal attorney?

17       A.    Because it was approved by the board.

18       Q.    Is there a vote that approved that?

19       A.    Yes.

20       Q.    Was that vote before or after Jones Day

21   was paid?

22       A.    I believe it was before.

23       Q.    When was Jones Day retained by

24   Mr. DiCamillo?

116

1    A.    I don't recall specifically.

2    Q.    Was it sometime in the summer or after the

3    summer of 2001?

4    A.    I don't recall the specific date.

5    Q.    But if I understand, at the same time

6    Polaroid was having all these financial problems,

7    its board authorized to pay Mr. DiCamillo's personal

8    counsel.  Is that right?

9    A.    The board authorized the payment to Jones

10   Day to give Mr. DiCamillo certain advice, yes.

11   Q.    What was the advice they were giving him,

12   concerning what subject?

13   A.    I believe it was related to the effects of

14   the potential restructuring on Mr. DiCamillo.

15   Q.    The payments that were made on the eve of

16   bankruptcy, the few days before bankruptcy, did you

17   submit to the bank, Chase JP Morgan, a schedule of

18   the amounts of money that Polaroid intended to pay?

19   A.    I don't know.

20   Q.    Did Polaroid operate with a revolver?  Did

21   it have a revolving loan with the bank?

22   A.    Yes.

23   Q.    Just so I'm clear and the record is clear,

24   any cash that Polaroid got in on a given day all

117

1    went to pay down the loan.  Is that right?

2        A.    I don't know.  I don't.

3        Q.    But your understanding is it had a

4    revolver?

5        A.    Yes.

6        Q.    Now, I see here JP Morgan was paid like on

7    October 2nd 1.8 million, 1,840,000-plus dollars.

8    What was that in connection with?

9        A.    I don't know.

10       Q.    You just don't know?

11       A.    I don't know.

12       Q.    Who is Keystone Associates?

13       A.    What page are you on?

14       Q.    It's on the payments to creditors, 46 of

15    88, Schedule 3A.  Do you know who that is?

16       A.    I don't, no.

17       Q.    Was that a landlord or you just don't

18    know?

19       A.    I don't know.

20       Q.    I also saw on the next page Peat Marwick

21    was paid just a shade under $300,000 on October 4,

22    2001, and also $50,000 on October 11.  That was the

23    day before the bankruptcy.  Right?
24       A.    Correct.

118

1      Q.    What was that for?

2      A.    I don't know.

3      Q.    The bank approved that?  Chase approved

4    that payment?

5      A.    I don't know.

6      Q.    Was Peat Marwick the accountants for

7    Polaroid?

8      A.    KPMG were the accountants for Polaroid.

9      Q.    I'm sorry.  Who is Leo Burnett Company?

10     A.    Leo Burnett is an advertising agency.

11     Q.    Used by Polaroid?

12     A.    Yes.

13     Q.    McDermott Will & Emery:  Did Polaroid

14    retain McDermott Will & Emery?  I see them listed as

15    a payment in September of 2001.

16     A.    They did some work for us, yes.

17     Q.    On what subject?  My only concern is, did

18    it have anything to do with the restructuring

19    advice?

20     A.    I think it's primarily environmental

21    advice.

22     Q.    McKinsey & Company, I see several payments

23    to them.

24     A.    What page are you on?

119

1    Q.    51 of 88.  McKinsey & Company.

2    A.    Yes.

3    Q.    What did they do for Polaroid?

4    A.    Consulting.

5    Q.    On what subject?

6    A.    Business planning.

7    Q.    Did they give you advice on restructuring?

8    A.    No.

9    Q.    What is Nucam Corporation?

10   A.    What page?

11   Q.    57.

12   A.    I don't know.

13   Q.    Have you ever heard that name before?

14   A.    I believe they're a manufacturer; a

15   contract manufacturer, I believe.

16   Q.    Do they have any affiliation with

17   Polaroid?

18   A.    I don't think so.

19   Q.    What's Orange County Art?

20   A.    Where are you?

21   Q.    Next page.

22   A.    I don't know.

23   Q.    Riemer & Braunstein, a law firm, they did
24   work for Polaroid?

120

1       A.    Yes.

2       Q.    Did they do work in connection with the

3    restructuring?

4       A.    No.

5             MR. TORMEY:  Would you identify the pages

6    as you go along?  It would be helpful.

7    BY MR. GREENBERG:

8       Q.    Page 67.  I'm sorry.  They did work for

9    Polaroid?

10      A.    Start again.  What's the question?

11      Q.    Riemer & Braunstein, did they perform

12   legal services for Polaroid?

13      A.    Yes.

14      Q.    In what subject area?

15      A.    Primarily on the divestitures of

16   businesses, sale of businesses.

17      Q.    Who represented JP Morgan Chase?

18      A.    Davis Polk.

19      Q.    Did Polaroid pay directly or indirectly

20   the fees that Davis Polk incurred?

21      A.    When?

22      Q.    Prior to the bankruptcy.

23      A.    In what period?
24      Q.    In the period July-August-September-early

121

1    October.

2        A.    I would have to look at the terms, the

3    terms of the loan agreement to see the reimbursement

4    provision.

5        Q.    Now, page 72 refers to payments to Simpson

6    Thacher and Skadden Arps.  Were those in connection

7    with the restructuring advice?

8        A.    Well, Simpson did a lot of work for us in

9    addition to restructuring.

10       Q.    But Skadden had to do with the

11   restructuring.  Is that correct?

12       A.    Primarily.  They picked up other work as

13   well but, yes, primarily.

14       Q.    What is Zolfo Cooper LLC, page 87?

15       A.    They're financial advisers to Polaroid.

16       Q.    What were the services that they rendered?

17       A.    They've done work on assisting the company

18   in creating budgets, in creating cash flow analyses,

19   advice on restructuring.

20       Q.    They provided restructuring advice?

21       A.    Yes.

22       Q.    Did you have any contact with them?

23       A.    Yes.
24       Q.    During what time period?

122

1       A.    From the time they were engaged.

2       Q.    I see several payments to Zolfo in the

3   time period August-September-early October.

4       A.    Yes.

5       Q.    Did they provide any advice with respect

6   to the issue of eliminating retiree medical expense?

7       A.    They might have worked on some cost issues

8   related to that.  They might have done some cash

9   flow projections.

10      Q.    Who at Zolfo Cooper was responsible for

11  the Polaroid relationship?

12      A.    Steve Panogos.

13           MR. GREENBERG:  Why don't we take a three-

14  minute break?  We'll finish up by 1:30 if not

15  before.  Just give me five minutes.

16           (In recess 1:00 p.m. to 1:02 p.m.)

17  BY MR. GREENBERG:

18      Q.    Am I correct that Polaroid had a separate

19  retiree medical plan for retirees who were 55 to 65

20  and then a different plan for people who were 65 or

21  over?

22      A.    I'm not sure of the form, whether it was

23  one plan or two plans.

24      Q.    And that was really my question.

123

1      A.    I don't know the answer.

2      Q.    Because we've only gotten one document,

3   which is entitled The Polaroid Retiree Medical Plan

4   Effective October 9, 2001.  To the best of your

5   knowledge as chairman of the plan administration

6   committee, is there a separate document for retirees

7   that are under 65 and a separate one for those that

8   are over 65 or is there just one document?

9      A.    I don't know the answer.

10     Q.    What department at Polaroid is in charge

11  of the documentation of the retiree plans?

12     A.    Compensation and benefits.

13     Q.    But that's the legal department at

14  Polaroid?

15     A.    No, it's the human resources department.

16     Q.    Is there a lawyer within that department

17  or a lawyer within general counsel's office who is

18  responsible for assisting that department?

19     A.    Yes.

20     Q.    Who is that?

21     A.    Louise Cavanaugh.

22          MR. GREENBERG:  The other thing is, let me

23  just mark this.  It's the Polaroid annual return

24  report of employee benefit plan for calendar 2000,

1   it's the Form 5500. We'll mark this as the next

2   exhibit.

3          (Goldman Deposition Exhibit 9 marked for

4   identification.)

5   BY MR. GREENBERG:

6      Q.   First of all, do you have any familiarity

7   with Exhibit 9, Mr. Goldman?

8      A.   No.

9      Q.   Exhibit 9 at least references the name of

10  the plan, it says Polaroid Hospital Surgical Medical

11  Plan and Polaroid Retiree Medical Plan.  Do you

12  know, are those two separate plans or are they one

13  plan?

14     A.   I don't know.

15     Q.   Do you know, are you familiar with the

16  terminology a wrap plan, w-r-a-p?

17     A.   No.

18     Q.   Do you know if Polaroid maintains or

19  maintained a wrap plan?

20     A.   I don't know.

21     Q.   With respect to the letter that was sent

22  out that your name was stamped on, were you involved

23  in establishing the protocol for advising retirees

24  of the board's action?  You have Exhibit 3 in front

125

1    of you.

2        A.    I'm sorry.  I don't understand the

3    question.

4        Q.    Did you give anyone instructions

5    concerning sending Exhibit 3 out to retirees?

6        A.    No.

7        Q.    Was that a subject that you have any

8    knowledge on, as to how that information was

9    disseminated to retirees?

10       A.    No.

11       Q.    Who made the decision as to how to send

12   this information out?

13       A.    I believe Mary Kelly and Louise Cavanaugh

14   did, I believe.

15       Q.    Did people at Polaroid actually go to the

16   mailbox and stuff the envelopes and put these

17   letters, Exhibit 3, in the mail to retirees?

18       A.    No.

19       Q.    What did Polaroid do?

20       A.    I'm sorry.  I believe we used a third

21   party to mail these notices.

22       Q.    When you say a third party, what was the

23   third party you used?
24       A.    I don't know.

126

1    Q.    When were they retained?

2    A.    I don't know.

3    Q.    Were they retained before October 9?

4    A.    I don't know.

5    Q.    Who was responsible for delivering these

6    letters to this third party?

7    A.    Mary Kelly.

8    Q.    And did Ms. Kelly know before the board

9    vote that this subject, the termination, was going

10    to be acted on by the board?

11    A.    I don't know.

12    Q.    The third-party processor that you used

13    was located in Rhode Island?

14    A.    I learned that recently.

15    Q.    You didn't know it at the time?

16    A.    No.

17    Q.    Who selected that processor?

18    A.    I don't know.

19    Q.    Were you surprised to learn they were

20    located in Rhode Island?

21    A.    No.

22    Q.    Do you know how the notices got from --

23    Strike that.  Who actually prepared the envelopes

24    that would go with these letters?

1       A.    I don't know.

2       Q.    Was there a mailing list that was given to

3    the provider?

4       A.    I don't know.

5       Q.    Do you know when the letters went out to

6    the retirees?

7       A.    No.

8       Q.    Have you made any inquiry on that subject?

9       A.    No.

10      Q.    Has anyone reported to you on that

11   subject?

12      A.    I recall being told that the notices were

13   mailed on October 9.

14      Q.    Who told you that?

15      A.    I believe I heard that from either Mary

16   Kelly or Louise Cavanaugh.  I don't recall

17   specifically.

18      Q.    Well, how could it be mailed on October 9

19   if the board didn't meet --

20      A.    Not mailed.  Sorry, I take that back.

21      Q.    What did they tell you as to when these

22   notices were mailed to retirees?

23      A.    My understanding was that these notices
24   were mailed on October 9.  Now, I didn't inquire

128

1    what "mailed" meant.

2        Q.    Does someone have a record of these

3    mailings?

4        A.    I don't know.

5        Q.    Who told you that they were mailed on

6    October 9?

7        A.    I believe Louise Cavanaugh did.

8        Q.    So she told you they delivered the

9    envelopes and the letters to Rhode Island and they

10   were stuffed in Rhode Island and then taken to the

11   mailbox all on October 9?

12       A.    No.

13       Q.    What did she tell you?

14       A.    I believe she told me they were mailed on

15   October 9.

16       Q.    Prior to the board meeting, the conclusion

17   of the board meeting, did Ms. Cavanaugh have the

18   Exhibit 3?  Did she have these form letters signed

19   by you?

20       A.    Yes.

21       Q.    You had already signed it?

22             MR. SAUNDERS:  Object to the form of the

23   question.

24             MR. GREENBERG:  Strike that.

129

1    BY MR. GREENBERG:

2        Q.    The letter was in final form.  Is that

3    right?

4        A.    I believe it was.

5        Q.    Had it already been delivered to Rhode

6    Island?

7        A.    I don't know.

8        Q.    When was your signature affixed to Exhibit

9    3?

10       A.    I don't know.

11       Q.    Was it prior to October 9?

12       A.    Probably.

13       Q.    Do you think that Polaroid did anything

14   wrong, notifying the retirees that their benefits

15   were being terminated effective immediately?

16            MR. SAUNDERS:  Object to the form of the

17   question.

18       A.    Wrong in what sense?

19       Q.    Anything wrong.  As a human being, do you

20   think they did anything wrong?

21            MR. SAUNDERS:  Hold on a second.

22   BY MR. GREENBERG:

23       Q.    Do you think they did anything wrong?
24            MR. SAUNDERS:  Instruction not to answer.

130

1  BY MR. GREENBERG:

2      Q.   Well, you would agree with the statement

3  that you didn't look out for the best interests of

4  the retirees in your capacity as chairman of the

5  plan committee?

6          MR. SAUNDERS:  Object to the form of the

7  question.

8      A.   No, I wouldn't.

9      Q.   Well, what did you do in August, September

10  or October prior to the bankruptcy filing to try to

11  protect the interests of the Polaroid retirees?

12          MR. SAUNDERS:  Object to the form of the

13  question.

14      A.   The responsibilities of the fiduciary were

15  to carry out the plan and the fiduciaries carried

16  out the plan while the plan was in effect.

17      Q.   But wouldn't you agree with the statement

18  that one of the responsibilities of a fiduciary, if

19  the plan is going to be terminated, is to implement

20  an orderly termination of the plan in a manner which

21  protects the interests of retirees?

22          MR. SAUNDERS:  Object to the form of the

23  question.

24      A.   No.

1    Q.   Did you make any inquiry at any point in

2    time prior to the bankruptcy filing as to what your

3    legal responsibilities were as a plan fiduciary?

4    A.   Would you repeat the question?

5         (The reporter read the question.)

6    A.   Yes.

7    Q.   And with whom did you seek advice?

8         MR. SAUNDERS:  Object to the form of the

9    question.

10   A.   Gary Ford.

11   Q.   When was that?

12   A.   I don't recall specifically.

13   Q.   What month?

14   A.   I don't recall specifically.

15   Q.   What did you ask Mr. Ford?

16        MR. SAUNDERS:  Object to the form.

17   Instruction not to answer.

18        MR. GREENBERG:  On what basis?

19        MR. SAUNDERS:  You're asking him for legal

20   advice he received from Mr. Ford.

21        MR. GREENBERG:  In his capacity as plan

22   fiduciary.  You don't represent the plan.  I mean,

23   if you're going to take that position, I asked him

24   specifically in his capacity as plan fiduciary.  You

1    guys don't represent the plan.

2              MR. SAUNDERS:  Well, I warn you,

3    Mr. Goldman, that there's probably --

4              MR. GREENBERG:  If you're going to

5    instruct him, I'm just raising this issue if you are

6    going to instruct him.  If you believe you have a

7    valid instruction based on privilege, I just raise

8    the issue, which is that the question had to do with

9    his role as plan fiduciary.  If you believe that

10   that is an attorney-client issue where Mr. Ford is

11   apparently giving advice to the plan fiduciary, I

12   mean, it's not my call.

13             MR. SAUNDERS:  I agree with you to the

14   extent that I'm not counsel to the plan.  I don't

15   have the power to instruct the witness not to answer

16   to protect that plan's privilege.  But I can

17   certainly warn the witness of the probable existence

18   of such a privilege and that he ought to act

19   carefully in answering questions about it; and that

20   he ought to consider, independent of my instructing

21   him, he ought to consider whether or not he's got an

22   obligation to refuse to answer questions about legal

23   advice that he received as the plan administrator.

24   BY MR. GREENBERG:

133

1       Q.    Just so we're clear, Mr. Ford is a partner

2   of the Groom Law Group?

3       A.    Correct.

4       Q.    And that was paid for by Polaroid?

5       A.    Correct.

6       Q.    Now, you consulted him in your capacity as

7   a plan fiduciary.  Is that right?

8       A.    I'm not clear in responding whether or not

9   he was advising the company or he was advising the

10  plan administrator.  I'm not completely clear in my

11  response.

12      Q.    What advice did you seek from him?

13      A.    We asked clarification of the role of the

14  plan administrators.

15      Q.    Can you be more specific?

16      A.    In terms of exercising their fiduciary

17  duties.

18      Q.    You asked advice on that?

19      A.    Yes.

20      Q.    So you specifically wanted advice as it

21  related to the termination?

22      A.    No, in general terms.

23      Q.    Well, I'm focusing on --
           MR. SAUNDERS:  You didn't tell him you
24

134

1   were focusing on anything.  If you want to focus him

2   on it now, please do, but that's not where you were.

3   BY MR. GREENBERG:

4        Q.    Focusing on the late summer/early fall of

5   2001, did you seek advice on the subject of the plan

6   fiduciary's obligations as they related to the

7   potential termination of the retiree plans?

8        A.    No.

9        Q.    Why didn't you seek advice on that

10  subject?

11       A.    Because it's not the role of the plan

12  administrator to terminate retiree medical plans.

13       Q.    Did someone ever advise you that you had

14  no fiduciary role in connection with implementing

15  the termination of these plans?

16       A.    What?

17       Q.    Bad question.  I withdraw the question.

18  Bad question.

19            Did you ever seek advice as to whether or

20  not you had a fiduciary duty as it related to

21  implementing the termination of the plan?

22       A.    The plan administrator did not implement

23  the termination of the plan.

24       Q.    Did you seek advice concerning whether or

135

1    not you should sign Exhibit 3?  That's the

2    termination letter.

3            MR. SAUNDERS:  Object to the form of the

4    question.

5        A.    Whether or not I should sign the letter?

6        Q.    Yes, whether or not you should sign the

7    letter.  Did you seek advice, legal advice, on that

8    subject?

9        A.    I didn't seek legal advice -- I did not

10   seek legal advice as to whether or not I should put

11   my signature to a page.

12       Q.    Did you seek legal advice in connection

13   with your notifying retirees in accordance with

14   Exhibit 3?

15       A.    Yes.

16       Q.    From whom did you seek the advice?

17       A.    Groom & Associates.

18       Q.    When?

19       A.    I don't recall specifically.

20       Q.    What month?

21       A.    I believe it was October 2001.

22       Q.    Did they have a copy of the letter?

23       A.    I believe they do.
24       Q.    Prior to giving you the advice.

136

1     A.    I believe they saw a draft.

2     Q.    And what did you ask them and what did

3     they say to you?

4              MR. SAUNDERS:   Instruction not to answer.

5     BY MR. GREENBERG:

6     Q.    Who paid their legal fees?

7     A.    Polaroid.

8     Q.    And you were seeking advice in what

9     capacity?  In what capacity were you seeking advice

10    from them?

11    A.    On behalf of the company.

12    Q.    On behalf of Polaroid?

13    A.    Yes.

14    Q.    Did you ever seek advice from them in

15    connection with your activities as chairman of the

16    plan administration committee insofar as it related

17    to the termination?

18    A.    No.

19    Q.    Is it correct, based on your

20    understanding, that if JP Morgan Chase had been

21    willing to fund the retirement benefits in a chapter

22    proceeding, that Polaroid would not have terminated

23    those benefits?

24              MR. SAUNDERS:   Object to the form of the

1   question.

2       A.   Would you repeat the question?

3       Q.   Yes.  Is it your understanding that if JP

4   Morgan Chase had been willing to fund in a DIP

5   financing budget the cost to provide the

6   continuation of Polaroid retiree benefits, that

7   Polaroid would not have terminated those benefits?

8          MR. SAUNDERS:  Object to the form of the

9   question.

10      A.   No.

11      Q.   That isn't your understanding.  Was

12  discussion with JP Morgan Chase a factor in that

13  decision, the decision to terminate the benefits?

14      A.   Discussion about what?

15      Q.   About what amounts of money they were

16  prepared to fund.

17      A.   Yes.

18      Q.   The incentive retention payments, were

19  those discussed with JP Morgan Chase prior to the

20  filing?

21      A.   No.

22      Q.   Were they part of the budget, retention

23  payments, part of the DIP budget?

24      A.   I'm sorry, I'm confused.  Please start

1   over.

2       Q.   There was a DIP budget that was discussed

3   between Polaroid and JP Morgan prior to the filing.

4   Right?

5       A.   Correct.

6       Q.   And it was agreed upon.  Right?

7       A.   Yes.

8       Q.   And that final budget didn't include

9   retiree benefits.  Right?

10      A.   Correct.

11      Q.   And your understanding or your assumption

12  is that the earlier budget did.  Right?

13      A.   That an earlier budget, yes.

14      Q.   And that somewhere along the line between

15  the earlier budget and the final budget, retiree

16  benefits were eliminated?

17           MR. SAUNDERS:  Objection to the form of

18  the question.

19  BY MR. GREENBERG:

20      Q.   Right?

21           MR. SAUNDERS:  Based on his assumption.

22      A.   Yes.

23      Q.   Now, in the final budget, was there a
24  budget item for retention payments to key management

139

1    people?

2       A.    Yes.

3       Q.    And was that a negotiated item in the DIP

4    budget, as you understand it?

5       A.    I don't know.

6       Q.    Do you recall what the magnitude of the

7    retention payments were as initially proposed in the

8    initial DIP budget?

9       A.    I believe it was $12 million.

10      Q.    Roughly about a year's worth of retirement

11   benefits.  Is that right?

12      A.    I don't know what the actual dollars are

13   for the retiree medical benefits.

14      Q.    But the bank had agreed to that 12-

15   million-dollar item.  Right?

16      A.    That's my understanding.

17      Q.    Now, how many employees roughly were going

18   to get the benefit of that $12 million?

19      A.    I don't recall specifically.  Seventy-

20   five, eighty.

21      Q.    And how many retirees did Polaroid have as

22   of the Chapter 11 filing?

23      A.    I believe in excess of six thousand.
24            MR. GREENBERG:  Thank you.  I have nothing

140

1   more.

2        MR. SAUNDERS:  Let's go.

3        (Deposition concluded at 1:23 p.m.)

4

5

6

7

8   ---------------------------------------------

9                    DEPONENT

10  ---------------------------------------------

11  Neal D. Goldman

12    by Mr. Greenberg                Page 4

13

14  ---------------------------------------------

15    GOLDMAN DEPOSITION EXHIBITS FOR IDENTIFICATION

16  ---------------------------------------------

17  Exhibit 1   Page 8      Exhibit 2   Page 32

18  Exhibit 3   Page 75     Exhibit 4   Page 82

19  Exhibit 5   Page 89     Exhibit 6   Page 91

20  Exhibit 7   Page 95     Exhibit 8   Page 113

21  Exhibit 9   Page 124

22  (EXHIBITS RETAINED BY COUNSEL)

23
24

141

```
 1  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 2  DIRECTION OF COUNSEL TO THE WITNESS NOT TO ANSWER
 3  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 4  At page 28, line 14     At page 29, line 2
 5  At page 29, line 6      At page 58, line 5
 6  At page 58, line 20     At page 59, line 16
 7  At page 60, line 10     At page 80, line 21
 8  At page 87, line 4      At page 87, line 22
 9  At page 88, line 12     At page 107, line 5
10  At page 107, line 13    At page 129, line 24
11  At page 131, line 17    At page 136, line 4
12
13  ERRATA SHEET PROCEDURE              PAGE 142
14  COURT REPORTER'S CERTIFICATE        PAGE 143
15
16
17
18
19
20
21
22
23
24
```

```
1    ------------------------------------------------
2                    INSTRUCTIONS TO DEPONENT
3    ------------------------------------------------
4    After reading this volume of your deposition,
5    indicate any corrections or changes to your
6    testimony and the reasons therefor on the errata
7    sheet supplied to you, and sign it.
8              DO NOT MAKE MARKS OR NOTATIONS
9             ON THE TRANSCRIPT VOLUME ITSELF!
10   ------------------------------------------------
11          ERRATA SHEET HANDLING/DISTRIBUTION
12   ------------------------------------------------
13   The original of the errata sheet has been delivered
14   to Gregg M. Galardi, Esq.  When the errata sheet has
15   been completed by the deponent and signed, a copy
16   should be delivered to each party of record and the
17   original delivered to Annapoorni R. Sankaran, Esq.,
18   to whom the original deposition transcript was
19   delivered.
20
21         PLEASE REPLACE THIS PAGE OF THE TRANSCRIPT
22         WITH THE COMPLETED AND SIGNED ERRATA SHEET
23         WHEN YOU RECEIVE IT.
24
```

143

1    Commonwealth of Massachusetts )

2    County of Suffolk                    )

3            I, J. Edward Varallo, RPR, CRR (Registered

4    Professional Reporter, Certified Realtime Reporter),

5    Notary Public in the Commonwealth of Massachusetts,

6    hereby certify that on April 2, 2002, at the time

7    and place specified above, Neal D. Goldman, the

8    deponent herein, was duly sworn by me to testify to

9    the truth and was thereafter examined under oath by

10   counsel.

11           I certify that the questions asked of the

12   deponent and the answers given were taken down by me

13   stenographically and transcribed using computerized

14   translation software; and that the foregoing is a

15   true and accurate transcript thereof.

16           I certify further that I am not counsel,

17   attorney, or relative of any party litigant, nor

18   otherwise interested in the event of this suit.

19

20

21

22   _____

23           J. Edward Varallo, RPR, CRR

24   DATED: _____  My Commission Expires 01/09/2009